WISCONSIN TELEPHONE COMPANY, Respondent, vs. PUBLIC SERVICE COMMISSION, Appellant. [Two cases.]

*March 11—September 15, 1939.*

For the appellant there were briefs by the *Attorney General,* and *James Ward Rector,* deputy attorney general, and *Harold M. Wilkie,* special counsel, and *Daryal A. Myse,* counsel for the public service commission, and oral argument by the *Attorney General, Mr. Wilkie,* and *Mr. Myse.*

For the respondent there were briefs by *Miller, Mack & Fairchild,* attorneys, and *Baxter Milne* of counsel, and oral argument by *Edwin S. Mack, Frederic Sammond,* and *T. C. Bolliger,* all of Milwaukee.

The following opinion was filed July 11, 1939:

ROSENBERRY, C. J.   Upon this appeal the questions presented fall into two general classes: (1) Those relating to procedure and due process, and (2) those relating to the merits or a consideration of the rate base, a fair rate of return, and the income of the company.   We shall first consider those relating to procedure.   It may be said at this point that the classification is not accurate and there is some overlapping.

## PROCEDURE.

Among other things, the trial court found:

"53.   That the acts of the commission in the conduct of the proceedings before it, and the orders made in the proceedings, evidenced manifest unfairness, bias and a lack of judicial attitude on the part of the commission against the plaintiff.

"54.   That many of the issues decided against the plaintiff in the final order had been prejudged by the commission in temporary orders issued in the same proceeding without adequate hearing, and on incomplete evidence from the commission's staff and prior to the receipt of plaintiff's evidence therein or the completion of its cross-examination.

"55.   That during the course of the commission proceedings, there were prepared by members of the commission's staff, with its knowledge and approval, summaries of exhibits and statements setting forth prospective testimony of the commission's witnesses, phrased as if already given, which summaries and statements the commission customarily made available and delivered to representatives of the press, before the hearings at which such evidence was offered.

"56.   That substantially all of the final order, and of the prior temporary rate orders, were drafted by members of the staff of the commission, which members had been investigators and witnesses on behalf of the commission and against the plaintiff on the same subjects with which they respectively dealt in writing said orders.

"57.   That no commissioner attended all of the hearings and frequently successive hearings were presided over by different commissioners.   That none of the commissioners

examined all of the evidence in the proceedings prior to the issuance of the final order.

"58. That plaintiff repeatedly requested and was by the commission denied information as to the nature of contemplated orders, including the final order, and upon what grounds orders were proposed and what field was to be covered by them, as well as what changes were contemplated in the expense and investment data which were contained in the books of the plaintiff."

And upon this branch of the case, the trial court concluded as a matter of law:

"IV. That the presumptions contained in section 196.40 and in section 196.46 of the statutes of Wisconsin in favor of the validity of all actions by the commission have been destroyed in this case by the failure of the commission to give the plaintiff a fair hearing and to conduct the proceedings in an unbiased and unprejudicial manner as is required by the constitutions and the statutes. That said presumptions do not in any case apply to instances in which material errors of law are embodied in or underlie the commission's conclusions or the evidence on which such conclusions are based. However, all findings of fact and all other conclusions of law herein have been made as if said presumptions were in force.

"V. That the final order was issued without fair hearing and with such bias and prejudicial conduct by the commission that the order deprives the plaintiff of property without due process of law and denies to the plaintiff the equal protection of the law in violation of the constitutions of the United States and of the state of Wisconsin.

"VI. That the final order is unreasonable and unlawful because of failure to give the plaintiff the fair hearing to which it was entitled under section 196.26 of the statutes, and also because the order was not based upon an examination by the commission itself of testimony and records taken before a single commissioner or agent as required by section 196.24 (3) of the statutes."

The commission contends with respect to the findings of fact and conclusions of law relating to procedure and due

process: (1) That in this statutory proceeding the court had no jurisdiction to set aside the orders of the commission on the ground of lack of due process in the proceedings before the commission; and (2) that if the court has such jurisdiction then the procedure adopted accorded the company due process.

It is considered that we may at this point refer briefly to the function of this court in the consideration of appeals from orders of the commission such as are presented in this case. In view of two recent decisions, *State v. Tri-State Tel. & Tel. Co.* (1939) 204 Minn. 516, 284 N. W. 294, and *Pacific Tel. & Tel. Co. v. Wallace* (1938), 158 Or. 210, 75 Pac. (2d) 942, in which the fundamental law underlying a review of the rate-making process by the courts is fully examined, discussed, and restated, we do not feel called upon to re-examine and restate the law in connection with the decision in this case. In neither of these cases were the controversial points the same as in this case although very similar. All three cases have to do with the question of what constitutes a reasonable rate, the cases differing, however, as to some essential details.

At some points in the briefs, as well as in the oral argument, the discussion proceeds upon the theory that what this court is considering is confiscation. While that is the basic consideration in the federal courts, and must be considered by state courts where it is presented as necessary to a decision, it is not the primary function of this court or the circuit court under the law of this state, to consider confiscation.

Sec. 196.41 (1), Stats., is as follows:

"Any public utility or railroad and any person in interest being dissatisfied with any order or determination of the commission may commence an action in the circuit court for Dane county against the commission as defendant to vacate and set aside such order or determination on the ground that it is unlawful, or unreasonable, in which action the complaint shall be served with the summons."

Sec. 196.46, Stats., provides:

"In all trials, actions and proceedings arising under or growing out of the exercise of the authority and powers granted to the commission, the burden of proof shall be upon the party adverse to such commission or seeking to set aside any determination, requirement, direction or order of said commission, to show by clear and satisfactory evidence that the determination, requirement, direction or order of the commission complained of is unreasonable or unlawful."

Sec. 196.40, Stats., provides that all orders of the commission relating to rates, tolls, and charges shall be *prima facie* reasonable until found otherwise in an action brought pursuant to the provisions of sec. 196.41.

Under these provisions of the statute it is the function of the circuit court to set aside the order of the commission if it shall be found upon clear and satisfactory evidence to be, (1) unlawful, or (2) unreasonable. Without entering into any metaphysical discussion as to the meaning of the word "unlawful" it is sufficient for our purpose to say that it means not according to law, and that "unreasonable" means not based upon reason, arbitrary, capricious, absurd, immoderate, or extortionate.

The commission does not in establishing a rate exercise the full power of the legislature in that regard although the nature of the power it does exercise is legislative. Delegation of legislative power is sustained upon the ground that some standard for its exercise be set up and in addition thereto the legislature in making the delegation may prescribe the manner of the exercise of the delegated power. When the legislature itself has prescribed a rate by an act duly and regularly adopted, that rate may be assailed only on the ground that the act is confiscatory in its nature. When, however, the commission establishes a rate, its act must not only be nonconfiscatory but it must have been established in the manner prescribed by the legislature; otherwise it is not according to law and would be unlawful whereupon it would

become the duty of the court under the provisions of sec. 196.41, Stats., to vacate and set it aside.

It becomes important then to ascertain what power is delegated to the commission and in what manner it is required by statute to exercise it.

Sec. 196.26 (1), Stats., among other things, provides:

"(1) Upon a complaint made against any public utility . . . that any of the rates, tolls, charges . . . [are] unreasonable, insufficient or unjustly discriminatory, . . . the commission shall proceed, with or without notice, to make such investigation as it may deem necessary, *but no order shall be entered by the commission without a formal public hearing.*"

Sec. 196.28, Stats., provides:

"Whenever the commission shall believe that any rate or charge may be unreasonable or unjustly discriminatory . . . it may on its own motion summarily investigate the same with or without notice."

Sec. 196.29, Stats., provides:

"(1) If, after making such summary investigation, the commission becomes satisfied that sufficient grounds exist to warrant a formal hearing being ordered as to the matters investigated, it shall set a time and place for a hearing.

"(2) Notice of the time and place for such hearing shall be given to the public utility . . . as provided in section 196.26, and thereafter proceedings shall be had and conducted in reference to the matter investigated in like manner as though complaint had been filed with the commission relative to the matter investigated, and the same order or orders may be made in reference thereto as if such investigation had been made on complaint."

By sec. 196.70, Stats., it is provided:

"(1) The commission may by order when deemed by it necessary to prevent injury to the business or interests of the people or any public utility in case of any emergency to be judged of by the commission, temporarily alter, amend, or with the consent of the public utility concerned, suspend any

existing rates, schedules and order relating to or affecting any public utility or part of any public utility.

"(2) Such order shall apply to one or more of the public utilities in this state or to any portion thereof as may be directed by the commission, and shall take effect at such time and remain in force for such length of time as may be prescribed by the commission."

These provisions of the statute have been in force without substantial change since 1905. By secs. 2, 3, ch. 183, Laws of 1931, sec. 196.39 was amended and sec. 196.395 was added:

Sec. 196.39, Stats., provides:

"The commission may at any time, on its own motion or upon motion of an interested party, and upon notice to the public utility and after opportunity to be heard, rescind, alter or amend any order fixing rates, tolls, charges or schedules, or any other order made by the commission, and may reopen any case following the issuance of an order therein, for the taking of further evidence or for any other reason. . . ."

Sec. 196.395, Stats., provides:

"The commission may issue orders calling for a test of actual results under the requirements prescribed by such order, during which test period the commission may retain jurisdiction of the subject matter. The commission is empowered to issue conditional, temporary, emergency and supplemental orders. Where an order is issued upon certain stated conditions any party acting upon any part of such order shall be deemed to have accepted and waived all objections to the condition contained in such order."

The power of the commission to fix rates is conferred by sec. 196.37 (1), Stats., which provides:

"Whenever upon an investigation made under the provisions of chapters 196 and 197 the commission shall find rates, tolls, charges, schedules or joint rates to be unjust, unreasonable, insufficient or unjustly discriminatory or preferential or otherwise unreasonable or unlawful, the commission shall determine and by order fix reasonable rates, tolls, charges, schedules or joint rates to be imposed, observed and

followed in the future in lieu of those found to be unreasonable or unlawful."

In the 1934 order under consideration in this case the commission found that the then present rates of the company for exchange service were unjust and unreasonable and by the order established a just and reasonable rate for the temporary period in accordance with the terms of the order. As to the final order the rates established were to be applicable for the period subsequent to April 30, 1936.

A consideration of these statutory provisions becomes important in this case because the commission seeks to justify the issuance of the 1934 order for a temporary period by the decision in *La Crosse v. Railroad Comm.* (1920) 172 Wis. 233, 178 N. W. 867. In that case the utility filed a petition with the commission asking for an emergency increase of rates. After hearing, the commission granted the petition upon the ground that the cost of labor and fuel had so increased that the defendant company would be unable to make a fair return on its investment. Action was brought by the city of La Crosse and one Henry Rooney to set aside this order. The circuit court set aside the order on the ground that no emergency existed. The judgment of the circuit court was reversed. The court said (p. 237):

"The provisions for emergency rates and services were evidently designed to empower the commission to alter and suspend rates, schedules, and orders under emergency conditions for immediate protection of the public-utility business or the public interests during the time required by the commission to enable it to establish permanent rates and orders for adequate service. The facts of the record disclose that the commission was within its jurisdiction in promulgating the order of June 30, 1918, as an emergency order, if the facts and circumstances thus disclosed show that an emergency existed respecting the business of the defendant utility. The application for this emergency increase of gas rate and the order of the commission were obviously made upon the ground that the conditions incident to the war caused a large

and unexpected increase in the cost of labor, material, and supplies required to conduct this business."

In a somewhat similar case, *Smith v. Railroad Comm.* (1919) 169 Wis. 547, 173 N. W. 312, the commission had fixed rates for a street-railway utility in the city of La Crosse, and an action was begun to set aside the order of the commission, increasing the rates. There was a full hearing and the circuit court set aside the order on the ground that no emergency existed. On appeal the judgment of the circuit court was reversed on the ground that the order was sustainable as an application for relief in due course under the provisions of sec. 1797—12, Stats. (now with immaterial changes sec. 196.26). The court said (p. 553):

"It is clear from the record that the commission had jurisdiction to proceed, and that all parties interested were before the court and a full and .exhaustive hearing had, and the hearing covered all issues in the matter, and the procedure was the same as in other cases where a general rate hearing is had before the commission."

The emergency dealt with in *Smith v. Railroad Comm., supra,* was the same as that dealt with in *La Crosse v. Railroad Comm., supra,* that is, a situation created by war. The theory of the commission seems to be that having instituted a summary investigation under secs. 196.28 and 196.29, Stats., it might in the course of that investigation issue so-called temporary orders under secs. 196.39 and 196.395 without having completed a hearing. It is to be noted that sec. 196.39, which relates particularly to orders fixing rates, provides for an opportunity for the parties affected to be heard. What the commission may do upon the application of a utility in the way of increasing rates under emergency conditions is no measure of its power to decrease rates under similar conditions. Assuming that a rate is higher than a just and reasonable rate as a matter of law, the public is not deprived of its property because it has an option to accept or

decline the services. When, however, an unreasonable rate is established the property of the utility is taken because under the law it has no option to render or decline to render the service. It must render service in any event. Therefore the legal propositions involved are wholly different.

Sec. 196.39, Stats., by its terms applies specifically to orders fixing rates, tolls, charges, or schedules, and confers upon the commission authority to rescind, alter, or amend an order already made fixing rates, tolls, charges, etc. This is intended apparently to give the commission some power upon a hearing to amend an order already entered. The power contained in sec. 196.395 to issue conditional, temporary, emergency, and supplemental orders is subject of course to the procedural requirements of other provisions of ch. 196, Stats., because they are in *pari materia*. The legislature certainly never intended to authorize the commission to issue orders affecting the rights of citizens without giving citizens an opportunity to be heard. A legislative act purporting to confer such power would be clearly invalid. It would contain no standard for its application or any procedural limitations upon its exercise. If construed literally it would confer an arbitrary unlimited power. It is the duty of the court to avoid a construction which would render the statute unconstitutional.

It is considered that an order of the commission fixing rates, tolls, and charges can be made only upon an investigation and hearing; that the hearing to be given the parties affected is the hearing prescribed by sec. 196.26, Stats., which is a formal hearing.

In this case the commission elected to proceed under sec. 196.28, Stats., authorizing it to institute a summary investigation. Having instituted a summary investigation or resolved the Madison rate hearing into a summary investigation, the commission upon its own motion inaugurated a state-wide investigation, which is the proceeding here under

consideration. By the express provisions of sec. 196.29, the commission is required to give a notice of a hearing. After giving notice of a hearing as therein provided, it is required to proceed in like manner as though a complaint had been filed under sec. 196.26, which provides that no order shall be entered by the commission without a formal public hearing.

The term "formal hearing" is not defined in the statute. The word "hearing" has an established meaning in equity law. When used with reference to equity cases it means the same as the word "trial" does when used with reference to cases at law. *Akerly v. Vilas* (1869), 24 Wis. 165, 171. See *Ekern v. McGovern* (1913), 154 Wis. 157, 277, 142 N. W. 595.

"There are at least three substantial elements of a common-law hearing: (1) The right to seasonably know the charges or claims preferred; (2) the right to meet such charges or claims by competent evidence; and (3) the right to be heard by counsel upon the probative force of the evidence adduced by both sides and upon the law applicable thereto. If either of these rights is denied a party, he does not have the substantials of a common-law hearing. *Ekern v. McGovern, supra.*" *State ex rel. Arnold v. Common Council* (1914), 157 Wis. 505, 511, 147 N. W. 50.

That the word "hearing" includes "oral argument," see *State ex rel. Arnold v. Common Council, supra.*

By the express terms of the statute the power of the commission to act in fixing rates without the consent or against the objections of the utility is dependent upon its giving the utility a hearing. It therefore becomes necessary to consider whether the utility had a hearing in this case.

In its opinion, which preceded the 1934 order, the commission gave a history of the case. Among other things it said:

"The commission issued its first temporary order after eleven months of investigation in the *State-Wide Case*. The record at that time comprised 3,424 pages of testimony and 236 exhibits.

"The commission issued its second temporary order [1933] after twenty-three months of investigation in the *State-Wide Case*. The record at that time comprised 6,928 pages of testimony and 369 exhibits.

"The commission, as of July 5, 1934, is now issuing its third temporary order, after thirty-five months of investigation in the *State-Wide Case*. The record at this date comprises almost 7,721 pages of testimony and 428 exhibits.

"The commission has concluded both the accounting and engineering phases of its case, except as to actual appraisal or check of company's valuation of property representing about twenty-two per cent of the company's total exchange property. The company has introduced none of its case, except that in June, 1933, it offered certain evidence, particularly on excess plant and valuation, in response to the commission's order, and exhibits and testimony in June, 1934, presented by way of rebuttal of the commission's testimony.

"On April 2, 4, 5, and 10, 1934, the company cross-examined the commission's chief engineering witness, Mr. Cyrus G. Hill.

"On April 23, 24, 25, 26, May 2, June 4, 5, and 15, 1934, the commission introduced testimony and exhibits. . . .

"On June 19, 20, 21, 22, 23, 25, 1934, the company cross-examined on the commission's Milwaukee appraisal which had been introduced in April. . . .

"Counsel for the company stated that it was not yet practicable for them to submit further cross-examination. The status of the case at the present date, July 5, 1934, is therefore that we await further cross-examination by the company of the commission's engineers and also cross-examination by the commission's counsel upon the company's rebuttal evidence, presented June 20, 21, 22, 23, and 25."

From this statement it clearly appears that the company had not been accorded a hearing. When the 1934 order was made the commission had not completed its case and no part of the company's case had been presented although it had in part at least cross-examined some of the commission's witnesses. The company had not only a right to present its evidence but it had a right as a part of its right to a hearing,

to argue the matter upon the whole evidence to the commission.

The commission's view of the matter is best stated in its own language:

"Despite the fact that this case has now been in progress for three years, we are not yet able to enter a final order, particularly in view of the circumstance that the company has not presented its case except to the extent that it has done so in response to the commission's order or in rebuttal of the commission's evidence. That the company may not be required legally to offer its affirmative case until the commission has closed, we need not now argue.

"The fact remains, that the company has at all times had this opportunity, as sworn to by the affidavits of all the commissioners in the respective court cases, if indeed it were not axiomatic that any party will be heard by the commission to present its evidence upon application therefor (no such application being made in this case).

"It would seem to us to be a stultification of the state's regulatory power if, realizing that this case has already gone on for three years and may endure for a fourth, we should in the meantime be hamstrung and powerless to protect the public against rates which, based upon the evidence before us, are unreasonably high. Particularly is this consideration reinforced at the present time by the commission's engineering appraisal, which had not existed at the date of the two prior orders, and which, although cross-examination thereon may not be entirely completed, nevertheless demonstrates a *prima facie* case to indicate that the rate base herein determined, is conservative. Particularly when we balance appraisal by the commission's engineers of the Milwaukee exchange against appraisal by the company of the same exchange (which represents more than half of the exchange property in the state), then strike a reasonable mean, and work this result into value figures, viewing the return thereon, we are forced to conclude that we would be remiss in our duty if we did not issue a further temporary order at this time.

"To assert to the contrary and hold that we should have to go through the exhaustive process of hearings until every bit of direct and redirect, cross and recross, rebuttal and surrebuttal, has been completely introduced, sifted and argued

down to the last decimal, before even a temporary order may be issued, is to declare that the provisions which exist in the statutes in the various states for temporary orders, are meaningless and null.

"Section 196.395, Wisconsin statutes, specifically provides: 'The commission is empowered to issue conditional, temporary, emergency and supplemental orders.'

"We need not rely at all in the present order upon the emergency power under section 196.70, sustained by the supreme court of Wisconsin in *La Crosse v. Railroad Comm.* 172 Wis. 233, and set out in some detail in our two prior decisions.

"Nor at this date do we have to defend the issuance of a temporary order *without a valuation of the property,* such as has been declared lawful in other adjudications also mentioned in our two previous decisions.

"*O'Brien v. Public Utility Board,* 92 N. J. L. 587, P. U. R. 1919 D, 774, 777.

"See *Chicago Railways Co. v. Chicago,* 292 Ill. 190; *Oklahoma Gas & Electric Co. v. Corporation Comm.* (Okla.) 201 Pac. 505; *Bartlesville v. Corporation Comm.* (Okla.) 199 Pac. 396; *Muskogee Gas & Electric Co. v. State* (Okla.), 186 Pac. 730; *Omaha Street Railway v. Railway Comm.* (Neb.) 173 N. W. 690.

"We recognize, however, the limitations involved in issuing a temporary order. The rate imposed may not be confiscatory, even though the order is temporary.

"*Prendergast v. New York Tel. Co.* 262 U. S. 43, 67 L. Ed. 853.

"Moreover, even in the issuance of a temporary order, there must be afforded what is a reasonable opportunity, under the circumstances, for the production of evidence.

"In *Indiana General Service Co. v. McCardle,* 1 Fed. Supp. 113, a statutory court granted the interlocutory injunction against a temporary order, the record disclosing, among other things, that the hearing occupied a *single* day and consisted merely of testimony by one commission engineer and one commission accountant, the commission thereupon ordering a twenty per cent reduction.

"In *Rockland Light & Power Co. v. Maltbie* (Sup. Ct., N. Y.), P. U. R. 1933 E, 113, a temporary utility rate reduction was suspended where it was shown that the commission had *excluded* certain testimony and exhibits offered by the

utility which established *prima facie* that the temporary rates prescribed by the commission would yield a return of less than four per cent on the value of the utility's property.

"In *Tri-State Tel. & Tel. Co. v. Benson* (U. S. District Court, D. Minnesota, Third Division), Sept. 14, 1932, P. U. R. 1933, 38, an interlocutory injunction was held justified against a temporary order, the court reviewing the evidence presented by both the company and the commission in court but referring to the record before the commission as follows [p. 43]:

"In the case at bar, the record shows that the order was based upon evidence on the part of the commission only; that the company was given no opportunity to cross-examine the witnesses, or to produce witnesses in its own behalf, or to make arguments on the evidence received.

"We believe that our action in the present case is not repugnant to any of these three recent decisions but that, on the contrary, in the handling of the present temporary order, we are well within the reasonable and legal limits laid down by the authorities."

The authorities cited by the commission do not sustain its position. *O'Brien v. Public Utility Board* (1919), 92 N. J. Law, 587, 106 Atl. 414, related to actions brought one by O'Brien and the other by the city of Trenton to set aside an order of the public utility board increasing the rates of a utility. The court said (p. 590):

"It will not, we apprehend, be claimed that the fixing of a rate of five cents to be charged to each passenger for transportation was the result of any valuation. That sum seems to have been accepted by the railway corporations and the public as a reasonable rate to be paid by the public for the services rendered under the normal conditions existing when the rate was established and, after so many years of the existence of such a rate without question, it must be assumed that the public and the serving corporation have both acquiesced in the reasonableness of such a charge, and that its reasonableness has been demonstrated by experience. What the utilities board did in the case under consideration was to add to the existing rate a sufficient sum to meet the increased cost of operation due to increased taxes and labor cost im-

posed by the agencies of the national government to meet expenditures in the prosecution of the war with Germany, all of which was carefully ascertained through testimony showing that the increase was necessary to prevent a deficit in operation."

*Omaha & C. B. Street R. Co. v. Nebraska State Railway Comm.* (1919) 103 Neb. 695, 173 N. W. 690, was a similar case. It appears that the situation dealt with in that case was due to an unexpected rise in the price of wages which made it improbable that the present rate would yield sufficient revenue to pay a fair return. The company sought an increase in fares from five to seven cents. This the commission refused to grant. Upon appeal to the supreme court the order of the state railway commission denying the increase was reversed with directions to issue a temporary order for increase in rates.

*Chicago Rys. Co. v. City of Chicago* (1920), 292 Ill. 190, 126 N. E. 585, was also a case where rates had been increased pursuant to the order of the public utilities commission. The contention in that case was that the rate was fixed by contract and it was so held by the circuit court. Upon appeal, the circuit court was reversed and the public utilities commission affirmed.

The cases from the state of Oklahoma cited by the commission are not in point because of the peculiar constitutional and statutory provisions to be found in the state of Oklahoma. In that state when the court upon appeal reverses an order of the corporation commission, the court fixes the proper rate or charge. Sec. 23, art. IX. In addition to that, the decision in *Oklahoma Gas & Electric Co. v. Corporation Comm.* (1921) 83 Okla. 281, 201 Pac. 505, rests in part for its authority upon *Omaha & C. B. Street R. Co. v. Nebraska State Railway Comm., supra.* The propositions stated in that case were advanced to sustain an increase in rates whereas in the Oklahoma case the administrative order under consideration provided for a reduction in rates. The

fundamental difference in the facts of the two cases seems not to have been observed.

In a certain sense an order reducing rates and fares is not temporary. If the order prescribes a rate unreasonably low, the company loses its just revenue permanently during the prescribed period. An order even though it may by its terms operate only a year, may therefore be unjust and unreasonable or even confiscatory for that matter and is final so far as the revenues of that year are concerned. In the 1934 order the commission set up a procedure for modification. It had followed this practice in the 1932 and 1933 orders. So far as we are advised no modification was ever made of any order. The mere reservation of the power to amend or alter the order, nothing having been done pursuant thereto, does not justify the order. The commission said:

"Because of the uncertainties which prevail today affecting the volume of business and costs of operation, the commission will keep a check on the realized effects of this present order in its actual operation. We are ordering the company to submit monthly reports reflecting changes in gross revenues and in operating costs related to exchange business during the period covered by this temporary order so that we will be in a position to determine, as a result of this test in actual operation, how the order is working out in practice, and be in a better position to modify the order if the facts require."

No doubt the failure of the commission to consider modification of the order was due to the fact that the enforcement of the order was suspended by court injunction and therefore never operated over any period.

In *Northern Pacific R. Co. v. Department of Public Works* (1925), 268 U. S. 39, 44, 45 Sup. Ct. 412, 69 L. Ed. 836, the supreme court said:

"But where rates found by a regulatory body to be compensatory are attacked as being confiscatory, courts may enquire into the method by which its conclusion was reached. An order based upon a finding made without evidence [Cit-

ing] or upon a finding made upon evidence which clearly does not support it [Citing] is an arbitrary act against which courts afford relief. The error under discussion was of this character. It was a denial of due process. [Citing.] *The invalidity was not avoided by making the order, in terms, for an experimental period.* The rates as to which the evidence was primarily directed were those in force before and during the hearings. If even the existing rates were confiscatory, as the carriers' evidence embodying the results of ample experience tended to show, there could be no reason for awaiting the test of the much lower rates which were prescribed."

Even by way of test or experimentation the state may not confiscate the property of a citizen. Because of this fact various devices have been invented to produce a rate by the test of experience. If the utility is required over a limited time to operate on a diminished rate and experience shows the rate to be noncompensatory, its property is lost. *Smith v. Illinois Bell Tel. Co.* (1930) 282 U. S. 133–158, 51 Sup. Ct. 65, 75 L. Ed. 255; *Board of Public Utilities Comm'rs v. New York Tel. Co.* (1926) 271 U. S. 23, 31, 46 Sup. Ct. 363, 70 L. Ed. 808; *Pacific Gas & Electric Co. v. San Francisco* (1924), 265 U. S. 403, 44 Sup. Ct. 537, 68 L. Ed. 1075; *Northern Pacific R. Co. v. Department of Public Works, supra.*

On the other hand, if the utility is required merely to segregate or hold the difference between the existing rate and the ordered rate, then the public does not get the benefit of a reduction and there is no increase in revenues due to increased use. This situation was met in the state of New York by the enactment of a law which provided that the public service commission of that state might put in force a rate for a limited period, but the law also provided that if the experiment resulted in a loss to the utility, that loss was to be amortized and covered by the final rate when fixed, thus enabling the company to recoup its loss. That law was sustained by the court of appeals in the state of New York, in the *Matter of Bronx G. & E. Co. v. Maltbie* (1936), 271

N. Y. 364, 374, 3 N. E. (2d) 512. The court of appeals said:

"The commission fixes a temporary rate pending the hearing. It is based upon the elements stated, which are not all of those required to fix a permanent rate. As before stated, this would be impossible, if we must consider in fixing a temporary rate all the elements required for the final rate; no temporary rate could ever be fixed. This also is self-evident. Therefore, to meet these conditions the temporary rate is fixed, within reasonable limits, upon figures which can be with some exactness obtained from the books of the company, showing original cost of investment; and if finally, when the proceeding ends, the temporary rate is proved to have been too low, the utility must be permitted and authorized to charge enough for its service to make up the loss. The consumer must pay what he should have paid, and the only way to do it is to fix a rate high enough to make up this loss."

As to the character of a temporary rate, see *Prendergast v. New York Tel. Co.* (1922) 262 U. S. 43, 43 Sup. Ct. 466, 67 L. Ed. 853.

In *Driscoll v. Edison Light & Power Co.* (1939) 307 U. S. 104, 59 Sup. Ct. 715, 83 L. Ed. 1134, the supreme court had under consideration a statute of the state of Pennsylvania which contains a provision similar to that found in the statutes of the state of New York. However, in the *Driscoll Case,* it appears from the opinion that there was a full and complete hearing as to the rate base. The provisions with reference to recoupment, Purdon's Pa. Stat. Anno. 1938, Supp., title 66, § 1150 (c), are as follows:

". . . If, upon final disposition of the issues involved in such proceeding, the rates as finally determined, are in excess of the rates prescribed in such temporary order, then such public utility shall be permitted to amortize and recover, by means of a temporary increase over and above the rates finally determined, such sum as shall represent the difference between the gross income obtained from the rates prescribed in such temporary order and the gross income which would

have been obtained under the rates finally determined if applied during the period such temporary order was in effect."

While sec. 196.395, Stats., provides that the commission may issue orders calling for a test of actual results, the statute contains no provision for amortization of the loss if in a rate case the so-called temporary rate should prove to be noncompensatory. As already pointed out, the cases hold that in establishing a rate for the future, and in the absence of statutory authorization therefor, the commission may not amortize a loss or make a rate sufficiently low to recapture the excesses. Denominating an order a temporary order does not operate to make applicable to it a different rule of statutory procedure than would otherwise be applied to it; in determining the validity of a temporary order the same tests must be applied that are applied to an order in due course under the quoted provisions of the statute. It is clear that with reference to rates, the commission has no authority to make an order without first giving the utility a hearing, whether the order be styled temporary or an order in due course, and it is immaterial whether the order is made upon a complaint, upon a summary investigation, or upon the commission's own motion.

The commission seems to have been of the view that although the company had presented none of its evidence, and the commission had not completed its own, the company had had a hearing. No doubt proceedings before administrative tribunals are not required to be conducted with all the formality of a hearing or trial in a court. It is only necessary that the essentials be preserved. It is difficult to see how even in an administrative hearing the utility can present its case until it is advised as to what it must meet. This is not a case where the company was applying for a change in rates and was therefore under an obligation to go forward with its proof. This proceeding was instituted upon the commission's own motion, and it undertook to establish the basis for

a finding, (1) that the existing rate was unlawful and unreasonable, and (2) what constituted a lawful and reasonable rate.

At the time the 1934 order was issued there was substantially nothing before the commission except the facts produced by the employees of the commission who had not yet completed their investigations. Otherwise than by the issuance of the order and the course of the proceedings, the company in this case was not advised of what it was the commission sought to do,—the company contends that it had no notice of the purpose and intention of the commission to issue temporary orders, which would give it an opportunity to produce evidence with respect to the matters determined in the temporary orders. Certainly there was no hearing in any legal sense. We do not need to consider in this case what constitutes a minimum of hearing to accord the company due process of law. In this case the statute prescribes that no order shall be issued until a hearing has been held. Being present at the presentation of the evidence offered by and on behalf of the commission and cross-examining some of its witnesses without opportunity to offer the evidence of the company in rebuttal and to present arguments based upon all the evidence does not amount to a hearing as that term is used in the law. Each session of the tribunal is in ordinary parlance frequently referred to as a "hearing." Such a hearing is not a hearing within the meaning of sec. 196.26, Stats. The conclusions of the commission based upon its own evidence, a large part of which was presented by members of its staff, could hardly be otherwise than prejudicial to the rights of the company, and that is especially so in this case where the determinations of the commission seem to derive very largely from general economic conditions. Such conditions except so far as they disclose definite economic trends have very little bearing upon a rate case. In the New York and Pennsylvania cases already referred to, the rate base was derived from the books of the company in accordance with

the provisions of the statute. We think this is a sound and proper procedure. A utility is in no position to impeach its own books. The public is protected by reason of the fact that the accounts of a public utility are and have been for many years subject to rigid regulation and supervision both as to form and substance. When a rate base is derived from the books and provision is made for amortization of losses if application of the rates produce a loss, the company is fully protected and may not complain. In this case it did not appear from the books of the company that the existing rates were unlawful or unreasonable. It is only by "adjusting" the rate base down and the net income up that the existing rates were made to appear unreasonable. Thus, the income per books for the exchange system was $1,641,921. After adjustment it was $2,831,414. The book value of the exchange plant before allocation of terminal toll other than the property which the company books showed as toll investment amounted to $56,704,228. By the 1934 order the cost of reproduction new less depreciation including going value of the exchange plant was fixed at $34,386,807. These results were arrived at from the commission's 1934 order before the company had introduced any part of its case except certain evidence on excess plant and valuation in response to the commission's order and some exhibits and testimony in June, 1934.

Consideration of the opinion and order of the commission issued in 1934 shows that the hearing was incomplete and that the order was based upon a partial hearing. Certainly there can be no claim that the company had been accorded a formal hearing. We attach no particular importance to the use of the word "formal" in the statute. A full and fair hearing, a fair hearing, a formal hearing, and a hearing, all amount to the same thing in the law.

It is considered therefore that the trial court correctly held that the 1934 order should be vacated and set aside for the reason that the company had not been accorded a hearing in

accordance with the requirements of the statutes hereinbefore set out.

While, as indicated in the decisions of other courts, rate cases tend to drag out to interminable length and the rights of the utilities and the public often suffer on account of the length of hearings, the situation must be remedied in some way other than by a violation of the fundamental rights of parties. It seems to us that the statutory provisions of New York and Pennsylvania point to a solution of this difficult and perplexing problem. Under such statutes rates may be based upon experience rather than upon prophecy and guess work. If the methods suggested in those statutes be followed neither the public nor the utilities will suffer.

It may be thought that our determination in this case deprives the statute authorizing the issuance of temporary and emergency orders of any practical value. We think this is not a sound conclusion. Temporary and emergency rates may be appropriately and widely used where the circumstances are such as to justify them. The fact that a statute authorizes the issuance of temporary orders does not mean that temporary orders may be issued under any and all circumstances. We have already pointed out that with the consent of the company, its rates and tolls may be decreased without a hearing such as is required in an adversary proceeding. Likewise the commission is authorized to issue such orders for the increase of rates where it appears to it that such increase is in the public interest and necessary to preserve the property and rights of the utility. What must always be borne in mind is that there is wide difference between what may be done by way of increasing or decreasing rates upon the application of the utility or decreasing rates against the protest of the utility. When rates are increased upon the application of the utility, the commission consents for the public and the resulting order is in effect a consent order. When rates are decreased upon application of the utility a like consent order results if the commission

approves the decrease. The statute prohibits an increase or decrease of rates without the consent or approval of the commission. When, however, the utility objects and an issue is thus raised, the considerations which then govern the action of the commission are entirely different. The commission must then proceed with full regard to the statutory and constitutional rights of the utility.

## Final Order.

The court found with respect to the final order that due notice was given to the company, and ample time for presentation of evidence and for argument was accorded to the company, but concluded as a matter of law that the final order was issued without a fair hearing, and with such bias and prejudicial conduct by the commission that the order deprived the plaintiff of property without due process of law, and denied to the plaintiff the equal protection of the law in violation of the constitution of the United States and of the state of Wisconsin. This conclusion seems to be based upon the following statement of facts made by the trial court:

"It is admitted that none of the commissioners heard or read all of the evidence in the record. It is further admitted that in each of the orders important parts thereof, which contained and which were more or less decisive of the ultimate effect of the orders themselves, were prepared and written by witnesses appearing on behalf of the commission. These parts of the orders so prepared and written by such witnesses dealt with the issues before the commission upon which each of such witnesses had appeared as the principal witnesses. In the main, such parts of the orders were in full accord with the testimony given by the witnesses writing that part of the order. . . . This required the witness to sit in judgment upon his own testimony given under oath and to weigh such testimony in the balance as against the opposition witnesses of the plaintiff [the company], a party to the proceeding, and in opposition to the party for whom such witness had been called and had given testimony. [Witnesses named.]"

From the findings of the trial court it also appears that the commissioners were irregular in their attendance upon hearings, and that no one commissioner attended all of the hearings, except that the seventy-two hearings held after the 1934 order were all attended by one commissioner, the other commissioner attending thirty-three hearings. Continuing, the trial court said:

"Complaint is also made by the plaintiff that an atmosphere of antagonism to the plaintiff pervaded the proceedings and the action of the commission, which was in part manifested by propaganda and press reports. The record shows that the commission obtained a newspaper reporter to take an examination as a 'transportation inspector;' that his name was so entered upon the public pay rolls; that he performed no service in that capacity; that instead the commission instructed him to prepare and give out reports to the daily press of the doings of the commission; that in giving out news pertaining to these proceedings, with the knowledge and consent of the commissioners, he would interview witnesses for the commission and examine their exhibits in advance of the giving of the testimony and in advance of the introduction or use of such exhibits and therefrom prepare and give releases to the daily press, as if such testimony had already been given; that copies of such releases were refused to counsel for the plaintiff and that none of the plaintiff's witnesses were so interviewed in advance."

While the 1932 order and the 1933 order were not before the circuit court for consideration, because of the fact that the 1934 order and final order referred to the 1932 and 1933 orders and the 1934 and final orders are in part based upon conclusions reached in the two earlier orders, the trial court was of the view that it was necessary to consider all of the orders in order to present a complete picture of the attitude of the commission so far as it pertains to denial of due process. We do not concur in the view of the trial court that the defects of the 1932 and the 1933 orders are so incorporated in the 1934 order and the final order as to invalidate them. It is true there were not four proceedings. There was but

one, in the course of which the commission issued in addition to the final order three interlocutory or so-called temporary orders. However, as a matter of fact, upon the issuance of the 1932 and 1933 orders, the commission did consider the testimony already introduced by it, and while because of such consideration it may have to a certain extent prejudged the matter, this did not preclude a full, fair, and open consideration of the whole record when it came to the issuance of the final order and the making of the findings upon which it was based.

The trial court criticized very severely the fact that before listening to arguments of counsel for the company, the commission made and signed the 1933 order. After having made and signed the order, it then heard the arguments. This was of course irregular and not in accordance with ordinary procedure before courts or commissions. However, the order had not been issued. It was still under the control of the commission, which still had power to modify or alter it. Without in any way approving such procedure, it is considered that it does not affect the validity of the order which was in fact issued after arguments had been heard.

In connection with procedural matters before administrative bodies we quote from *Omaha & C. B. Street R. Co. v. Nebraska State Railway Comm.* (1919) 103 Neb. 695, 701, 173 N. W. 690. In this case the court had under consideration an order of the railway commission denying an increase of rates. The court reversed the order of the commission denying the increase and remanded the case with instructions to order an increase. The court said:

"Complaint is made by the plaintiff company of the attitude of the commissioners, or some of them, or their manner of conducting the hearing. We admit that it is a little startling to the lawyer, bred in the courts, who is submitting his controversy to a body having judicial powers, to see a member of that body conduct a cross-examination and hear him express opinion upon the merits before the case is finally

submitted. Not only is impartiality the supreme virtue of courts as ministers of the law, but the courts have always recognized that their functions can be best exercised and protected under conditions which exclude any invasion of the partisan or personal element, or the appearance of it. Accordingly they have been hedged about by forms and rules calculated to inspire the greatest respect for the position the judge occupies. That which may appear to be anomalous inheres more or less in the nature of the proceeding and the unusual powers vested in the state railway commission. The division of the powers of the state into legislative, executive, and judicial is natural. Aristotle pointed out long ago the difficulties and dangers of lodging lawmaking powers in the executive department of government. Courts, as such, know only adversary parties and are unsuited to the work of commissions.

"The state railway commission is clothed with certain legislative, judicial, and administrative powers, but a review of its action is reserved to the courts. In the exercise of its legislative and administrative powers, it must be that it exercise those functions, and hence conduct for itself those investigations which will enable it to legislate wisely. It must be permitted to see to it that the evidence necessary is adduced, and to take the legislator's attitude as to what the law should be. The commission, as a co-ordinate department of the state, acts independently. In the exercise of its prerogatives, it is not subject to dictation or criticism by the courts, except as what transpires may be a proper subject of review, as bearing upon the orders or judgments of the commission. The courts, ordinarily, in reviewing the work of arbitration boards and commissions, give ready attention to any complaint on the part of either of the parties that the body hearing the matter was actuated by any feeling of bias or prejudice, or other improper motive. The commission is free to adopt its own rules and course of procedure, and to do everything necessary to inspire and bring about absolute respect for it and its judgments. It may preserve decorum, and under some circumstances may punish for contempt. Being, in fact, neutral as between the parties, and conducting its hearings, not *ex parte,* nor as a partisan debate between it and either of the parties, it may avoid all appearance of bias or prejudice. Upon review of the record in this

case, we find nothing to indicate that the commission has been actuated by any desire other than to do justice to the utility, on the one hand, and the public, on the other."

In this connection, however, we call attention to *State ex rel. Madison Airport Co. v. Wrabetz* (1939), 231 Wis. 147, 285 N. W. 504.

We discover no authority to sustain the proposition made that the trial court may enter upon an independent investigation to determine the mental attitude of the commissioners who sat upon the case to discover whether they were unfair, biased, and prejudiced. In *Morgan v. United States* (1938), 304 U. S. 1, 58 Sup. Ct. 773, 82 L. Ed. 1129, evidence was taken in the action to review with respect to the nature of the hearing accorded by the secretary, but this is an entirely different thing than trying the question of the mental attitude of the administrative tribunal in an action to review one of its orders.

If there appears in the record evidence of bias or prejudice on the part of the commissioners which is of such a character as to deprive the company of a fair hearing, an entirely different question would be presented. With respect to the exercise of the fact-finding power, the administrative process more nearly parallels that of the judicial process than of the legislative process. We find no authority which holds that an appellate or reviewing court may enter upon an investigation *de hors* the record to determine whether or not the judge who tried the case was biased or prejudiced. Upon reason it would seem that such an investigation would operate to destroy the usefulness of the whole judicial system. It is not an uncommon thing for unsuccessful litigants to accuse judges and courts of bias and prejudice. If litigants were entitled to have that question tried *de novo* in the reviewing court, one can scarcely imagine the consequences. It is considered therefore both upon authority and reason that the trial court was not warranted in trying the issue of whether

the commission was in fact biased or prejudiced upon testimony not found in the record made before the commission. See in this connection *General A. F. & L. Assur. Corp. v. Industrial Comm.* (1937) 223 Wis. 635, 652, 271 N. W. 385.

The commission is a statutory body. Its powers are limited and prescribed by the statute. There is no provision for anything corresponding to a change of venue. If the contention of the company on this point should be sustained, it is conceivable at least that a case might never be brought to a final determination because it might be found that the commission was biased or prejudiced. While there are some acts of the commission or some of the commissioners which seem of a questionable character, and in this connection we refer especially to the signing of the order of 1933 before hearing argument with respect to it and the systematic furnishing of advance reports to the press of what witnesses for the commission were to testify to in a proceeding pending before the commission, it cannot be said that these were of such a character as wholly to vitiate the proceeding before the commission. The statutory duties of the commission place it in a very difficult position. While it is almost inevitable that it will be subject to criticism for so doing, it must furnish the evidence largely from members of its own staff or witnesses employed by it as experts. It must also act as prosecutor in the case, and when the case is completed, it must exercise the judicial function, and it would be strange indeed if somewhere along the line it had not taken some step which would subject it to criticism, especially if it be judged by standards applicable to courts. We do not find in the record evidence of any bias or prejudice against the company as such. Energetic and perhaps overzealous prosecution of a case may lead to an appearance of bias and prejudice. Bias and prejudice attributable to some feeling against the company is an entirely different thing than zeal in the discharge of a highly important public duty.

The company contends that the orders under consideration were unlawful because the procedure followed by the commission was unconstitutional for two reasons: (1) Because the company was not fully apprised of the issues and the nature of the order which the commission proposed to issue; (2) that the decision of the commission on the greater part of the issues was prepared and written by witnesses who testified on the trial on behalf of the commission.

The only notice that the company had as to the nature and extent of the investigation was that given it by the order of July 29, 1931. The 1931 order grew out of and was in part based upon matters adduced in the Madison rate case, which in turn was based upon a petition of the company to increase Madison exchange rates. The order has already been set out *in extenso*. From the order it appears that the commission determined to institute on its own motion an inquiry into the rates, charges, tolls, services, rules, practices, and activities of the company, which was to be comprehensive and exhaustive.

It is considered that the company may not justly complain of lack of notice. Such notice as the statute requires was given. We may at this point as well as at any other give consideration to a matter bearing upon the matter of notice. Sec. 196.405, Stats., introduced into ch. 196 of the statutes by sec. 3, ch. 183, Laws of 1931, makes elaborate provision for rehearing before the commission. This statute was quite evidently designed to prevent utilities from taking advantage of any inadvertence, omission, or error in proceedings before the commission. Sub. (2) provides:

"The application for a rehearing shall set forth specifically the ground or grounds on which the applicant considers said order or determination to be unlawful or unreasonable. . . ."

This provision, together with the requirement in sec. 196.44, Stats., that if additional evidence is taken before the court the record may be sent back to the commission for further consideration, insures full consideration by the com-

mission upon contested points and gives the commission full opportunity to make any desired corrections.

Sub. (5) of sec. 196.405, Stats., provides: "It is hereby declared that the legislative powers of the state, in so far as they are involved in the issuance of orders and decisions by the commission, have not been completely exercised until the commission has acted upon an application for rehearing. . . ."

This provision implies that the proceeding in a rate case is not complete until a motion for rehearing has been made. After the issuance of each of the four orders, there were motions for rehearing, exhaustive specifications of claimed errors. The motions for rehearings were granted and at the rehearing the whole matter was reargued.

It is considered that this statute, in addition to insuring the commission opportunity to make any desired corrections, gives the utility full opportunity to present and argue the matter to the commission upon the basis of its findings and decision, and it obviates and cures any defect in the proceeding relating to notice. The legislative process not being complete at the time of the rehearing, the matter is open, and by the terms of the statute, the moving party is required to specify the ground or grounds upon which he considers the order made to be unjust and unreasonable.

The company also complains that the findings were prepared from memoranda furnished by expert witnesses who were members of its staff or its employees; that these memoranda were in effect adopted by the commission as its findings with the result that the company was not apprised of the nature of the proposed findings, and therefore denied a hearing, under the doctrine of *Morgan v. United States* (1938), 304 U. S. 1, 58 Sup. Ct. 773, 82 L. Ed. 1129. In the *Morgan Case* findings were prepared in the bureau of animal industry, department of agriculture. When prepared they were submitted to the secretary who approved and signed them with a few slight changes. The findings were

one hundred eighty in number, and dealt with the practices and facilities of the Kansas City Livestock Market and matters relating thereto. No opportunity was afforded the appellant to examine the findings. The appellant sought a rehearing before the secretary but his application was denied. In disposing of the matter, the court said (p. 21):

"Conceivably, the secretary, in a case the narrow limits of which made such a procedure practicable, might himself hear the evidence and the contentions of both parties and make his findings upon the spot. Again, the evidence being in, the secretary might receive the proposed findings of both parties, each being notified of the proposals of the other, hear argument thereon and make his own findings. But what would not be essential to the adequacy of the hearing if the secretary himself makes the findings is not a criterion for a case in which the secretary accepts and makes as his own the findings which have been prepared by the active prosecutors for the government, after an *ex parte* discussion with them and without according any reasonable opportunity to the respondents in the proceeding to know the claims thus presented and to contest them. That is more than an irregularity in practice; it is a vital defect."

Conceding that the findings of the commission were made up on the basis of memoranda prepared by the various staff members and employees of the commission, most of whom were witnesses, it is considered upon the facts of this case that the doctrine of the *Morgan Case, supra,* does not apply. The final order of March 24, 1936, contains a full and complete analysis of all the evidence offered before the commission and covered one hundred eighty pages of the printed case. April 11, 1936, the company filed an application for a rehearing. This application pointed out alleged errors in the findings of the commission and raised substantially all of the questions that are raised here in relation to the facts upon which the determination or order of the commission was based. The application for rehearing was allowed and the matter was reopened and reargued before the commission on

April 17, 1936. As a result the commission made some minor adjustments or changes in its findings and as changed confirmed the findings as filed.

The facts in this case do not parallel the facts in the *Morgan Case, supra,* and are fundamentally different. Here the company was granted a rehearing when the findings and order of the commission were before it *in extenso.* The opinion disclosed the basis upon which the findings rested in such form as to be readily subject to analysis by the engineers, accountants, and counsel for the company. Nor does it appear that the final determination of the commission in this case was based entirely upon memoranda prepared by members of its staff and some of the witnesses in the case. Some parts of the final order appear to be substantial copies of this memoranda, but the discussion discloses that all of this memoranda was reconsidered and a considerable part restated by the commission.

The commission may not abdicate its power or delegate its fact-finding function to material witnesses. In cases, however, involving special or technical problems, the commission may without depriving a party of due process or a fair hearing delegate to members of its staff even though they have been material witnesses the duty of putting into proper form and technical language its findings upon engineering and accounting questions. There is no reason to suppose that the contribution of the witnesses to the findings was any more than that of casting them into technical language appropriate to the disposition of accounting and engineering problems. This function the commission was doubtless unequipped to perform. We conclude that the use of the technical staff in this way infringed no constitutional rights of the company and constituted no violation of the statutes, although where this procedure is adopted the doctrine of the *Morgan Case, supra,* does apply and notice of the findings should be served upon the company and an opportunity be

given for an argument on the basis of these findings. This right was accorded to the company when the rehearing was granted and the matter reargued.

Witnesses as well as members of the commission should make every effort to act in a fair and impartial manner. After all, they represent the interests of the state, and are not concerned with anything but the establishment of a lawful and reasonable rate. They are not, as attorneys are, endeavoring to win a case. The commission is of course charged with the duty of seeing that the work of its staff is done in a fair and impartial manner if it is to be accepted as a basis of decision.

The company further contends that it was deprived of a fair hearing with respect to the final order because the commission by the making of the 1932, 1933, and 1934 orders prejudged the case. As already indicated, the commission in recitals preliminary to the 1934 order indicated that no part of the company evidence had been introduced except a very small amount of rebuttal. The 1934 order, as were the preceding orders, was issued upon the basis of the evidence offered by the commission. Upon a consideration and analysis of this·evidence the commission concluded that the existing rates were unjust and unreasonable and ordered a reduction. However, when it came to the making of the final order, the opinion of the commission discloses that it gave consideration to the evidence offered and received on behalf of the company, which at the time the final order was made, had completed its case. The argument that the case was prejudged must rest almost entirely upon the fact that the findings of the commission and the final order to a certain extent adhered to the findings made on partial evidence as a basis for the previous orders. While there is some force to the argument that a tribunal which has once passed upon certain phases of a case does not approach the final determination in the same attitude of mind that it would have if it

had never passed judgment upon any part of the case, it cannot be said upon the record in this case that in the respects considered there was any such prejudgment by the commission as deprived the company of a fair hearing.

On behalf of the commission it is argued that the trial court did not accord the findings of the commission the weight to which they were entitled under the statute.

Sec. 196.46, Stats., provides:

"In all trials, actions and proceedings arising under or growing out of the exercise of the authority and powers granted to the commission, the burden of proof shall be upon the party adverse to such commission or seeking to set aside any determination, requirement, direction or order of said commission, to show by clear and satisfactory evidence that the determination, requirement, direction or order of the commission complained of is unreasonable or unlawful."

It is the contention of the company that under *Ohio Valley Water Co. v. Ben Avon Borough* (1920), 253 U. S. 287, 289, 40 Sup. Ct. 527, 64 L. Ed. 908, in an action to review the determination of the commission, the company is entitled to a trial *de novo* and an independent determination of the law and the facts upon the entire record, including both the commission record and the evidence taken in court, although in making this contention the company concedes that the court should accord to the commission's findings appropriate presumptions of correctness, and that errors must be demonstrated by clear and satisfactory evidence. *Wisconsin-Minnesota L. & P. Co. v. Railroad Comm.* (1924) 183 Wis. 96, 197 N. W. 359. Certain it is that the court must examine the record upon which the determination of the commission is based sufficiently to enable it to determine that the findings of the commission are in the zone of lawfulness and reasonableness. The last word upon this much-debated subject seems to be found in *St. Joseph Stock Yards Co. v. United States* (1936), 298 U. S. 38, 56 Sup. Ct. 720, 80 L. Ed. 1033. While the court pointed out in that case that where

the matter at issue was one of confiscation, the findings of the administrative body could not be made conclusive. It also said (p. 53) :

"But this judicial duty to exercise an independent judgment does not require or justify disregard of the weight which may properly attach to findings upon hearing and evidence. . . . Moreover, as the question is whether the legislative action has passed beyond the lowest limit of the permitted zone of reasonableness into the forbidden reaches of confiscation, judicial scrutiny must of necessity take into account the entire legislative process, including the reasoning and findings upon which the legislative action rests. We have said that 'in a question of rate-making there is a strong presumption in favor of the conclusions reached by an experienced administrative body after a full hearing.' *Darnell v. Edwards,* 244 U. S. 564, 569. The established principle which guides the court in the exercise of its judgment on the entire case is that the complaining party carries the burden of making a convincing showing and that the court will not interfere with the exercise of the rate-making power unless confiscation is clearly established."

The issue in this case was confiscation. It applies, however, at least by analogy to cases involving the finding of a reasonable rate under the statute.

This court has held from the beginning, *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* (1908) 136 Wis. 146, 116 N. W. 905, that much weight should be attached to the findings of the commission. It is quite probable that courts will and should more closely scrutinize the record in cases involving confiscation than in cases involving other kinds of administrative action where the power exercised is dominantly legislative and no constitutional right is involved. In this case the trial court in its opinion referred to *St. Joseph Stock Yards Co. v. United States, supra,* and other cases.

As disclosed by the fourth conclusion of law, the trial court was of the view that the presumptions contained in sec. 196.40 and sec. 196.46, Stats., had been destroyed by

reason of the failure of the commission to give the plaintiff adequate notice and an unbiased and unprejudiced hearing; the trial court nevertheless said that all its findings of fact and all conclusions of law herein were made as if such presumptions were in force.

It is very difficult to ascertain by a comparison of the findings made by the commission with those made by the trial court considered in connection with the evidence which supports them, whether the trial court gave full effect and the statutory weight to the findings of the commission, this for the reason that the findings made by the commission contain a great deal of discussion, rationalization, and argumentative matter, none of which has any place in findings of fact however helpful they may be in enabling the court to discover the commission's approach to the various problems presented. It is quite evident from the record that the trial court was very much impressed by the fact that in its opinion the commission had acted in a biased, arbitrary, and prejudicial manner.

This court does not sit as a court of review of the findings of the commission. It is a part of its function to determine whether the trial court proceeded in a proper manner and in accordance with the statutory provisions to review the determination of the commission. We are therefore required to determine what weight should be given by this court on an appeal from the judgment of the circuit court to the findings of the trial court. The statute nowhere attempts to set up standards to be applied by this court in reviewing the judgment of the trial court in rate cases.

The rule in this state long established is that findings of fact made by a trial court will not be disturbed on appeal to this court unless they are contrary to the great weight and clear preponderance of the evidence. See cases cited 1 Callaghan's Wis. Dig. p. 306, § 587.

In reviewing the determination of the trial court that a rate fixed by the commission is unlawful and unreasonable,

it is the duty of this court to examine the record to determine whether the trial court committed error. This court does not approach questions of fact from the same standpoint that the trial court approached them. If the trial court applied correct principles of law and accorded the findings of the commission the weight to which they were entitled under the statute, the determination of the trial court must be upheld unless it is clearly wrong. This court determines questions of law for itself.

Under the doctrine of the *St. Joseph Stock Yards Co. Case, supra,* the complaining utility is entitled to have the independent judgment of the court reviewing the record made before the commission. But in the exercise of its independent judgment the reviewing court should give much weight to the determination of the commission. What this court reviews is the record in the circuit court and if no reversible error is discovered the judgment of the trial court must be affirmed.

The trial court found that the presumptions contained in secs. 196.40 and 196.46, Stats., in favor of the findings and determination of the commission were destroyed in this case by the failure of the commission to give the company a fair hearing and to conduct proceedings in an unbiased and unprejudicial manner.

We have already held under the facts of this case that bias and prejudice did not deprive the company of due process of law. We come now to a consideration of how the bias and prejudice found by the trial court affects the weight to be given to the findings and determination of the commission. An examination of this question imposes upon this court a duty of a disagreeable nature but one which it must discharge. In the beginning we may say that we acquit the commission of any intentional disregard of the rules of law which govern its actions. It seems to us that the commission entered upon this inquiry in a state of mind induced by the existing depression which more or less subconsciously

led it to a position where it was very difficult, if not impossible, for it to give a dispassionate judgment upon the facts. Prior to the issuance of the 1932 order, and apparently as a basis for the whole investigation, the commission brought before it a number of nationally known economists, among whom were Dr. F. C. Mills, Dr. E. R. A. Seligman, Dr. Frank A. Fetter, Dr. C. K. Leith, and others. The economists gave a large amount of testimony relating to general economic conditions, their cause and probable effect, and on the basis of that testimony arrived at certain underlying conclusions. Among other things the commission in the 1932 order said:

"The present depression is no minor disturbance. It constitutes an economic crisis of major proportions. . . . There are facts in the record relating not only to the country as a whole but especially to Wisconsin farmers, wage earners, corporations, and citizens generally. These are the customers of the utilities under our jurisdiction.

"When their incomes on the average have shrunk by twenty-five per cent or more, when less than a third of Wisconsin corporations report taxable incomes, when farmers receive fifty per cent less than in 1929, when all measures of wage-earners' livelihoods show unprecedented losses, we surely are not dealing with any minor disturbance. The prices of most commodities have been drastically cut, though in varying proportions. But utility rates and a few other prices have virtually stood still. . . .

"Threatened or actual loss of utility service to large numbers of Wisconsin consumers seems to us clearly an 'injury to the interests of the people.'

"We are aware of the difficulties of measuring precisely the impaired purchasing ability of thousands of scattered consumers, each with his own budget of expenses. . . . We believe that the facts in the record, relating to the economic position of utility consumers, are sufficient and that they constitute the chief data readily available. . . .

"The commission therefore finds and determines from the facts and foregoing considerations that an emergency within the contemplation of section 196.70 exists and that this emergency injures the 'business and interests of the people.'

"The weight which we attach to this finding of emergency can be briefly indicated. . . . In addition, the existence of an emergency alters materially the weighting that should be given to factors influencing a reasonable rate of return. Indeed, what is a reasonable return in an economic emergency may be quite different from a fair return in less critical times. To this subject we shall refer in more detail later in this opinion. . . .

"If existing conditions continue and the drop in the general level of prices persists it may be necessary to fix rates in which the value of the service becomes an important and decisive factor and that time may be near at hand. Then more exact measures of value of service can and will be fashioned. In the light of economic history it is inevitable that the value of service must again be applied by utilities in order to keep their rates within the area where it may fairly be said that they are no greater than the services rendered are reasonably worth. . . .

"Our investigation, though incomplete, thus far shows clearly that even on the present record existing rates are unreasonable and excessive and that substantial reductions therefrom would undoubtedly be necessary at the completion of the investigation (unless in the meantime conditions so change as to require a revision of our judgment). Temporary relief pending the completion of the investigation is justified by the facts thus far developed, and we so find. It would be a travesty on the processes of regulation if, because the investigation is yet incomplete, we would defer the reduction of rates, when clear and convincing proof is in our hands requiring such reduction."

Having determined almost wholly upon the basis of general economic conditions that the existing rates of the company were too high, a consideration of the whole record indicates that the commission then sought by means of further investigation, evidence which would sustain its conclusion already arrived at. In the same opinion, the commission said:

"Having made no finding of fair value we have, of course, made no finding as to what percentage return upon fair value the rates ordered will produce, and such a determination we

believe unnecessary for the purposes of this interlocutory order. The rates fixed will produce sufficient revenue to permit of a return which is fair to the company. *Neither our statutes nor the state or federal constitution require that any particular procedure shall be followed so long as the net result is reasonable and does not deprive the utility of its property without due process of law."* (Italics inserted.)

This conclusion of the commission seems utterly to disregard the statutory provisions already referred to. Sec. 196.26, Stats., provides that no order shall be made without a formal hearing. The commission apparently upon general principles proposed to deprive the company of its revenues in order to aid its patrons and to level off the inequality resulting from the economic depression. The attitude of the commission disclosed at the beginning of the investigation seems to have been maintained throughout the whole process. A careful reading of the record, and especially of the findings of the commission and its opinions and orders, discloses that in the vast majority of instances, in all matters affecting the rate base, adjustments were uniformly made downward, in all matters affecting net income, adjustments were made upward, and a fair rate of return was found on the basis of an investigation made by a member of the staff to be $5\frac{1}{2}\%$. Having established these factors which are largely determinative of the controversy, the commission entered its final order. It appears that it did give some weight to the testimony offered by the company, but throughout it appears quite clearly that the commission was heading toward a predetermined conclusion. To fully demonstrate this would require us to set out *in extenso* many pages of matter. It is of course not true that no particular procedure is required by the statute. The statute as already pointed out is very definite and certain in that regard. Certainly, when only a part of the commission's testimony was in and practically none of the company's testimony was in, it would not be possible to say that there had been any hearing, let alone a formal or full hearing. There was at that time no basis except general

economic considerations for declaring the rate unreasonable or unjust. That this general attitude persisted is indicated by the opinion of the commission in connection with the order of 1933. In the course of that opinion it appears that the commission considered, in addition to the matters considered in 1932, the change in price of gold for coinage purposes, and what effect that would have upon the company, and it concluded as follows:

"Our review of the foregoing testimony and related matters, of which we take judicial notice, leads us to the conclusion that although some economic improvement has occurred since the extremely low levels of March, 1933, economic conditions at the present time, if they are above the level of April and May, 1932, are not so definitely and materially improved as to indicate that the economic emergency has definitely passed. In our review of the situation, therefore, the evidence supports the commission's findings and determination that until the price and currency situation becomes clarified an 'emergency exists within the contemplation of section 196.70 of the Wisconsin statutes and that this emergency injures the 'business or interests of the people' for the duration of this order. Our views with respect to the weight to be attached to this finding remain unchanged from those expressed in our order of June 30, 1932."

The experience of the company indicates that the commission was in the realm of prophecy in 1932 and 1933. The surplus of the company on December 31, 1930, was $9,401,483, and on December 31, 1936, it was $941,128.99, to which should be added the sum of $3,645,745, as the then net reserve in connection with rate-reduction orders. From this it appears that if the rate-reduction orders should be sustained, the surplus of the company in 1936 was only 10% of what it was in 1930. Nor do we find that the statute confers upon the commission any power to relieve the economic condition of consumers by taking property away from the utility and awarding it to its patrons. What the statute authorizes the commission to do after it has found that existing rates are unjust and unreasonable is to establish a just and reasonable rate which has been defined over and

over again. If the commission were empowered to review the whole internal economy of the state, its postulates and arguments might sustain the conclusion that it reached. Within the limits of its statutory authority, however, it had no right to give dominant weight to economic theory in the face of the statutory command. Recent years seem to have pretty thoroughly demonstrated that economic theory is vague, uncertain, and undependable, and that predictions based upon it are not reliable. It seems to be in constant need of repair and readjustment.

By July 5, 1934, the date of the third order, the commission abandoned its effort to sustain the order upon the ground that economic emergency existed but referred its power to sec. 196.395, Stats., which provides:

". . . The commission is empowered to issue conditional, temporary, emergency and supplemental orders. . . ."

It appears from the opinion of the commission, a part of which has already been set out, that the commission was of the view that because the hearing had gone on for three years and might continue for a fourth, it was imperatively necessary for it to issue a rate-reduction order; otherwise it would be hamstrung and powerless to protect the public against rates which upon the basis of the evidence then before it were unreasonably high in its opinion.

The commission does not exercise the entire regulatory power of the state. It may exercise only such powers as the legislature has seen fit to confer upon it and those powers must be exercised in the manner prescribed.

While the commission did not base the final order of March 24, 1936, upon the ground that an economic emergency existed, that it still clung to its economic theories is indicated by the opinion.

"During years of depression, when competitive industries are bending every effort to reduce costs and market services

and commodities at prices commensurate with reduced purchasing power, this company takes the position that rates cannot be reduced. It depends on justifying its rates on the basis of company-controlled expenditures and relies on the fact that no other more enterprising concern can take over its market by finding a way to reduce costs and the charges for service. In fact, during the period of retrenchment in other industries, the company's unit cost of maintenance labor increased by more than twenty-five per cent.

"Although the commission appreciates the distinction between competitive business and the public-utility industry, we cannot overlook increasing costs for public utilities during a period of decreasing costs for other industry. To perform our statutory duties effectively requires close scrutiny of operating expenses. Where a utility has a legally protected market area, it cannot also be immune from scrutiny of its controllable expenses. The protection given by law to the company should be matched by the correlative protection of the customer. Lacking competition, the customer's only protection is through a public agency examining the reasonableness of expenses, especially those expenses largely within the company's control which comprise about half the total operating expense. In the findings in this order, as well as in the temporary orders, the commission has found it necessary to adjust actual expenditure and to evaluate reasonable expense requirements. It is recognized, of course, that it is easily possible for the company to spend more. That fact, by itself, does not make the expenses reasonable."

This conclusion was also arrived at upon some theoretical basis adopted by the engineers retained by the commission. So far as we have been able to discover no effort was made to ascertain whether the expenses incurred by the company in its operations were reasonably necessary under the conditions existing at the time they were made. No claim that the company was recklessly and improvidently throwing away its funds is made. In an attempt to sustain its findings and in considering the so-called maintenance program, the commission said:

"Mr. Cummings [commission engineer] analyzed the company's preventive maintenance policies and concluded that the

program is overdone in comparison with economic requirements. Cummings pointed out that according to his estimates the cost of the company's preventive maintenance greatly exceeds the savings from the reduction in service difficulties. According to Cummings, the company has gone beyond the 'economic point' in development and application of routines and might economically lengthen the interval between inspections."

It appears that Mr. Cummings was retained by the commission to guide its judgment concerning maintenance. The amount which shall be expended by a public utility in the operation of its plant is in the first instance a question for the management. The commission is invested with no managerial powers.

In *West Ohio Gas Co. v. Public Utilities Comm.* (1935) 294 U. S. 63, 72, 55 Sup. Ct. 316, 79 L. Ed. 761, the court said:

"The company made claim to expenses incurred in procuring new business or in the endeavor to procure it, such expenses amounting on the average to $12,000 a year. The commission did not question the fact of payment, but cut down the allowance to $5,000 a year on the ground that anything more was unnecessary and wasteful. The criticism has no basis in the evidence, either direct or circumstantial. Good faith is to be presumed on the part of the managers of a business. (262 U. S. 276.) In the absence of a showing of inefficiency or improvidence, a court will not substitute its judgment for theirs as to the measure of a prudent outlay."

There was no showing in this case of improvidence or wastefulness.

The philosophy of management embodied in the opinions of the commission in this case would place the company in a managerial straight jacket. In this case the commission re-enforces its conclusion with respect to maintenance charges by reference to its determinations made prior to the issuing of the 1932, 1933, and 1934 orders. There are many other instances in the record which indicate that the commission dealt with theory rather than reality.

We have set out enough to indicate that while the company did not have a hearing of such a biased and prejudicial character as to deprive it of due process of law, the evident bias of the commission and some of its principal witnesses and its disregard of fundamental principles underlying the valuations of public-utility property in certain instances has been such as to require the reviewing court to scrutinize its determinations with great care. Under such circumstances the evidence necessary clearly and satisfactorily to establish the fact that the findings of the commission were wrong is much less than it would otherwise be and the force of the contention made on behalf of the commission that the trial court did not give sufficient weight to the findings of the commission is greatly diminished if not wholly dissipated.

The circuit court may set aside the findings and determination of the commission solely upon the ground that they are unlawful or unreasonable. (Sec. 196.41 (1), Stats.) The statute does not authorize the findings and determination of the commission to be set aside or vacated upon the ground that the commission has committed errors of law or made erroneous findings of fact unless and until it appears from the record that such errors of law and findings resulted in the establishment of an unlawful or unreasonable rate. If the rate established falls within the zone of lawfulness and reasonableness, it must stand even though in the opinion of the trial court or of this court the commission erred and a more reasonable rate might have been found.

It is evident that the reasonable rate to be found by the commission lies somewhere between the lowest rate that is not confiscatory and the highest rate that is not excessive or extortionate. In other words, despite what was said in *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* (1908) 136 Wis. 146, 116 N. W. 905, it is apparent that there is more than one rate that may be a just and reasonable rate. It is the function of the commission to determine the just and reasonable rate which shall apply in a given situa-

tion. As already stated, we do not approach the issue of confiscation in this case as from the beginning it has been held under the provisions of ch. 196, Stats., a rate may be unlawful or unreasonable within the meaning of the statute although not confiscatory. If the commands of the statute are obeyed, no constitutional questions arise. The statute itself has repeatedly been held to be a valid and constitutional enactment. Neither the trial court nor this court searches the record made before the commission to discover error. Errors will be examined, however, which are of such a character that an unreasonable rate has resulted. It is considered that the procedure followed by the commission in the making of the final order was in accordance with the provisions of the statute.

We now enter upon a consideration of the question whether the rate established is reasonable. The company contends that the rate established by the final order is unreasonable to the extent of being confiscatory. The commission on the other hand contends that the rate established is reasonable and should be sustained. ˙ Since *Smyth v. Ames* (1898), 169 U. S. 466, 546, 18 Sup. Ct. 418, 42 L. Ed. 819, it has been established that a public utility is entitled to earn a fair return upon the fair value of property used by it in the rendition of service to the public. Since that decision a great body of law has developed which has been reconsidered and restated in *State v. Tri-State Tel. & Tel. Co.* (1939) 204 Minn. 516, 284 N. W. 294, and *Pacific Tel. & Tel. Co. v. Wallace* (1938), 158 Or. 210, 75 Pac. (2d) 942.

As a basis for establishing a reasonable rate certain fundamental facts must be ascertained: (1) The fair value of the property used and useful in rendering the service; (2) the amount of income which will probably be produced by the rate to be established; and (3) what constitutes a fair return.

## RATE BASE.

The controversy in this case relates mainly but not entirely to the rate base. The approximate differences are disclosed

by a comparison of the findings of the trial court and the findings found in the final order of the commission, the court figures being found in Column (A) and the commission's figures in Column (B) of the following statement:

WISCONSIN TELEPHONE COMPANY v. PUBLIC SERVICE COMMISSION (CASES NOS. 4 AND 5).

COMPARISON OF RATE BASE CALCULATIONS.

By (A) TRIAL COURT, (B) COMMISSION.

| | (A) Court Decision (References: Ct. D. 29; C. 210; R. 882) | (B) Final Order (Page 106: C. 918; R. 2573) |
|---|---|---|
| 1. Hill's appraisal of reproduction-cost-new, as adjusted by commission (starting point of both) | $53,020,000 | $53,018,854 |
| 2. Add—Allowance for nonproductive time | 260,000 | (Tentatively conceded in order on rehearing) (C. 999; R. 2719) |
| 3. Add—Difference due to Hill's use of 1929 instead of 1934 Western Electric prices | 3,700,000 | |
| 4. Add—Difference due to Hill's earlier cut-off date for interest during construction | 1,061,036 | |
| 5. Corrected gross reproduction-cost-new | 58,041,036 | 53,018,854 |
| 6. Less—Excess or nonuseful plant | 117,972 | 4,241,508 (8%) |
| 7. Less toll and terminal toll allocation | 4,286,307 (7.4%) | 3,609,524 (7.4%) |
| 8. Less—Accrued depreciation | 5,251,039 (9.79%) | 12,859,279 (28.47%) |
| 9. Less—Interstate allocation | 241,929 (½%) | 161,543 (½%) |
| 10. Corrected reproduction-cost-new, depreciated, on local used and useful plant | 48,143,789 | 32,147,000 |
| 11. Plus—Working capital | 750,000 | 750,000 |
| 12. Plus — Amount allowed by commission for consideration of intangibles including going value | 2,103,000 | 2,103,000* |
| 13. Reproduction-cost-new less depreciation of intrastate local used and useful property including going value | 50,996,789 | 35,000,000 |
| 14. Adjusted investment Ct. D. 14 (C. 196; R. 869) | 53,467,000 | |
| 15. Adjusted investment final order p. 106 (C. 918; R. 2573) | | 35,513,214 |
| 16. Rate base found | $51,000,000 | $35,000,000 |

* In final order commission added this between lines 13 and 15 of above arrangement instead of between lines 11 and 13.

The valuation fixed by the court and by the commission is for exchange property only. This is due to the fact that

ultimately no consideration was given to toll rates. The order provides:

"The Wisconsin Telephone Company shall place in effect for all classes of intrastate exchange service and equipment for which rate schedules are on file with the commission, including all miscellaneous and incidental services and equipment, schedules of rates effecting a reduction of eight per cent of the revenues from such intrastate exchange service and equipment, except as hereinafter provided.

"Rates applicable to public pay stations, hand sets, charges for leased exchange telephone-typewriter service, special employees' rates, interstate exchange service, private-line services (including radio broadcasting), property rentals, loops and drops on toll circuits, telegraph commissions, discounts charged subscribers and directory advertising, are not affected by this order."

Two appraisals of the property were made, one by Hill as of December 31, 1934, for the commission, and one by Crowell as of April 1, 1935, for the company. The commission adjusted these appraisals as indicated by the following table:

## WISCONSIN TELEPHONE COMPANY.

### Value of Exchange Plant and Equipment Indicated by Book Cost and by Appraisals.

| Particulars | Book Cost December 31, 1934 | Hill's Appraisal December 31, 1934 | Crowell's Appraisal April 1, 1935 |
|---|---|---|---|
| Total exchange plant and equipment.. | $57,333,678 | $*49,256,212 | $†60,406,346 |
| Deduct excess plant indicated by Hill's appraisal (8.0%) ........ | 4,586,694 | *3,934,959 | 4,832,508 |
| Total used and useful plant and equipment ................. | $52,746,984 | $45,321,253 | $55,573,838 |
| Deduct toll allocation indicated by Hill's appraisal (7.4%) ........ | 3,903,276 | 3,370,041 | 4,112,464 |
| Local used and useful plant and equipment ................. | $48,843,708 | $41,951,212 | $51,461,374 |
| Deduct accrued depreciation (28.47%) | 13,905,804 | 11,943,510 | 14,651,053 |
| Net value of local used and useful plant and equipment ......... | $34,937,904 | $30,007,702 | $36,810,321 |
| Deduct amount allocable to interstate use (0.5%) ................. | 174,690 | 150,039 | 184,052 |
| Net value of local intrastate plant and equipment................ | $34,763,214 | $29,857,663 | $36,626,269 |
| Add working capital................ | 750,000 | 750,000 | 750,000 |
| Total indicated rate base......... | $35,513,214 | $30,607,663 | $37,376,269 |

\* Excludes dead drop wires included in Hill's appraisal.
† Includes all plant as shown in Exhibits C-303 and C-306.

After consideration of all the factors involved, the commission found the fair value of the used and useful exchange and equipment property to be not more than $35,000,000 as a going concern.

On December 31, 1934, as per the books of the company, the value of the exchange plant and equipment was $57,333,678. There was on the same day in its depreciation-reserve account $23,470,410. Of the depreciation reserve $16,321,099 was allocable to exchange plant and equipment.

It is to be noted that the difference between the rate base as fixed by the trial court and the rate base as fixed by the commission amounts to $16,000,000 (approximately the amount in the depreciation reserve account applicable to exchange plant), which difference is made up in the manner indicated in the table. The trial court found that there should be deducted from the cost of reproduction new on account of accrued depreciation $5,251,039, or 9.79% while the commission deducted on account of accrued depreciation $12,859,279, or 28.47%. The trial court followed the company's method of determining accrued depreciation. For the purpose of ascertaining the present physical value of the plant the company sent into the field a large corps of engineers and helpers who inspected the plant and arrived at the conclusion that there was an accrued depreciation of 9.79%. The commission on the other hand followed the theory of a member of its staff, Mr. Colbert. He contended that an inspection of the physical plant did not disclose the true amount of accrued depreciation. The federal communications commission defined depreciation as follows:

" 'Depreciation,' as applied to depreciable telephone plant, means the loss in service value not restored by current maintenance, incurred in connection with the consumption or prospective retirement of telephone plant in the course of service from causes which are known to be in current operation, against which the company is not protected by insurance, and the effect of which can be forecast with a reasonable approach to accuracy. Among the causes to be given consideration

are wear and tear, decay, action of the elements, inadequacy, obsolescence, changes in the art, changes in demand and requirements of public authorities."

In *Lindheimer v. Illinois Bell Tel. Co.* (1934) 292 U. S. 151, 167, 54 Sup. Ct. 658, 78 L. Ed. 1182, the supreme court of the United States said:

"Broadly speaking, depreciation is the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, inadequacy, and obsolescence. Annual depreciation is the loss which takes place in a year."

Pursuant to an order issued in 1913 by the interstate commerce commission, which then had under its supervision telephone companies, depreciation has been taken by what is known as the straight-line method. At the end of the year 1913 the company had a depreciation reserve of $3,810,803.59. In each year since that time there have been credits to the account, credit being the amount over and above the amount charged during each year on account of plant retirement and extraordinary repairs. It was conceded that the present condition of the plant was practically 90% of reproduction cost new so that the observed depreciation amounted to 10%, to be accurate, 9.79%.

The witness Colbert testified:

"In my judgment an engineer by an inspection of property could not determine the true amount of depreciation by examining and finding the amount of physical wear and tear on the property. Such a method leaves out largely those elements of depreciation such as obsolescence and inadequacy. It does not give due weight to the functional causes of depreciation. It does not give weight to the extent to which the service capacity of the property has been used up. In my figure as to depreciation I have given weight to all those factors."

The commission did not charge against cost of reproduction new the full amount of the depreciation-reserve account,

but did charge against it 28.47% of cost of reproduction new of used and useful exchange plant and equipment as found by it.

The company contends that differences between itself, the court, and the commission with respect to the elements of the rate base are largely differences of law and not differences of fact based upon the choice between the testimony of assisting experts.

Before proceeding further with this discussion it will be helpful to state the meaning which we attach to some words and phrases. By reserve depreciation we understand the amount which has been charged to ratepayers on account of depreciation which has not been used in retirements and extraordinary repairs. By accrued depreciation we understand the lessened service value of the plant due to its consumption in furnishing the service for which ratepayers are charged. Observed depreciation is that depreciation which can be determined by a physical inspection of the plant. The company contends that observed depreciation, actual depreciation, and accrued depreciation are one and the same thing. The commission made no physical inspection of the plant for depreciation purposes but based its findings upon the testimony of its witness, Mr. Colbert, who was also a member of its staff. His evidence is severely criticized by the company which alleges that he never had experience with such inspections or with depreciation of telephone property; that he had no accounting experience as to telephone utilities except such as he had gained in the employment of the commission, and that he did not even suggest that he had made a physical inspection with regard to depreciation. The testimony of Mr. Colbert shows much careful study of the company records as to retirements, replacements, service life of items, etc. It is fair and candid. If his premises be accepted, it is convincing.

The company contends that by the weight of authority the only method of determining depreciation as a valuation de-

duction is to examine the property and determine the extent of the physical deterioration, taking into account, any other present deterioration in value, such as obsolescence and inadequacy. The trial court adopted this view and cited in support thereof the following cases: *McCardle v. Indianapolis Water Co.* (1926) 272 U. S. 400, 47 Sup. Ct. 144, 71 L. Ed. 316; *Southern Bell Tel. & Tel. Co. v. Railroad Comm.* (D. C. 1925) 5 Fed. (2d) 77; *West v. Chesapeake & P. Tel. Co.* (1935) 295 U. S. 662, 55 Sup. Ct. 894, 79 L. Ed. 1640; *Western Buse Tel. Co. v. Northwestern Bell Tel. Co.* (1933) 188 Minn. 524, 248 N. W. 220. In addition, the company cites *Pacific Tel. & Tel. Co. v. Whitcomb* (D. C. 1926), 12 Fed. (2d) 279, 283, in which the court said:

"In other words, it was held that accrued depreciation is to be ascertained by an inspection of the property—by going and looking at it and making estimates based upon the facts which such examination discloses." (Citing cases.)

In a book entitled "Depreciation, a Review of Legal and Accounting Problems," prepared by the staff of the commission and published by it in 1933, on page 100, the following appears:

"In concluding this subject, however, we do not wish to minimize the legal precedence in favor of the broader view that in determining accrued depreciation, estimates by experts after examination of the property are entitled to more weight than mere mathematical calculations based on doubtful probabilities. In addition to the San Francisco and Indianapolis cases quoted above the following lower court decisions support similar views." (Citing cases.)

In this case the commission appears to have applied its theories as to depreciation instead of the "broader view" which has legal precedence. By legal precedence we understand the commission to mean the weight of authority.

Upon the other hand, the commission contends that *Lindheimer v. Illinois Bell Tel. Co., supra,* warrants the consideration by the commission of depreciation factors which are not

disclosed by a physical examination of the property. The *Lindheimer Case, supra,* was decided April 10, 1934, after the book on Depreciation was written. It will be necessary at this point to give some consideration to the nature of a depreciation charge based on the straight-line method. According to this method property of the various classes is supposed to have a service life of a given number of years. At the end of that time it must be replaced and it may or may not have a salvage value. If it has a salvage value the per cent of that value based upon the original cost is deduced from 100%. The remainder is divided by the service life in years. In that manner the annual depreciation rate is found. As an example, central office equipment has an average service life of fifteen years. It has a net salvage value of 15%. Dividing the 85% by fifteen years gives an annual depreciation charge of 5.7%. Manifestly, property does not diminish in value in accordance with a regular schedule. As one of the witnesses for the company testified, obsolescence does not accrue, it happens, but theoretically at the end of its service life the property will be retired and the company is entitled to charge a rate high enough to enable it to replace the property. If the annual charge for depreciation exceeds the amount of retirements, the difference must necessarily be found in the depreciation-reserve account. Theoretically, it is held by the company until such time as the retirement is necessary when it is used for replacement. The amount disclosed by the depreciation-reserve account is not kept in money, but is reinvested in the plant, and of course appears in the appraisal of the plant, and upon this the company, according to the authorities, is entitled to earn a return. The commission contends that if the company earns a return upon moneys derived from the ratepayers then it is getting in addition to a fair return upon its property an addition to its capital; in other words, the ratepayers are required to furnish capital for the company. The company, however, contends

that while this may appear to be so, it is not so in fact
because when it is required to replace the property the excess
will be used up, and so far as the ratepayers are concerned
the account will be square. This would undoubtedly be true
if the computations and estimates were accurate, but as a
matter of fact they never are. Some new invention may
require the retirement of a large amount of property, such as
the substitution of the dial for the manual system. Public
demands may increase due to relocation of highways, fur-
nishing of conduit in place of aerial transmission lines, and
in many other ways. Maintenance may be so thorough as to
prevent obsolescence.

There is one consideration that to our minds gives weight
to the contention of the commission. It was without dispute
that the present plant is 90% efficient, that is, it is equivalent
to 90% of a new plant. If there should be deducted from
the depreciation-reserve account, allocable to exchange plant,
10% of the book cost of the exchange plant and equipment,
there would remain in the depreciation reserve account
$13,785,231 allocable to exchange plant. The company
argues that this amount is held against future replacements.
The experience of the company seems to demonstrate that
at all times its plant is approximately 90% efficient. In other
words, its maintenance charges and charges for retirements,
etc., are sufficient to maintain the plant in a 90% condition
and to accumulate a depreciation reserve in addition. The
company has added to its depreciation-reserve account a sub-
stantial sum every year since 1913. It has in the interim
practically rebuilt its plant, or at least a large portion of it,
and the over-all age of the plant is now something like eight
years, although the original company was organized fifty
years ago.

It is also apparent that some depreciation factors are not
observable from physical inspection. The classical illustra-
tion of this is the electric light bulb. No one can tell by look-

ing at an electric light bulb how much of its service life has been spent. The length of time for which it will continue to be serviceable can be determined only by knowing its service life at the beginning and how much of it has been already spent. The witness Colbert based his conclusions as to the amount of reproduction cost new which should be charged off on depreciation upon a thorough study of the experience of the company as disclosed by its books, and although it was agreed that the plant was 90% efficient, Colbert found the accrued depreciation to be 28.47%.

In the *Lindheimer Case, supra,* a similar condition was disclosed. In that case, as in this, the present condition of the plant was found to be 90% of a plant free from defects or impairment of any kind. The evidence disclosed in that case that the aggregate amounts charged to operating expense on account of current maintenance and depreciation were from thirty to forty per cent of the total amount of operating expense. In disposing of that matter the supreme court of the United States said (p. 174) :

"In the light of the evidence as to the expenditures for current maintenance and the proved condition of the property—in the face of the disparity between the actual extent of depreciation, as ascertained according to the comprehensive standards used by the company's witnesses, and the amount of the depreciation reserve—it cannot be said that the company has established that the reserve merely represents the consumption of capital in the service rendered. Rather it appears that the depreciation reserve to a large extent represents provision for capital additions, over and above the amount required to cover capital consumption. This excess in the balance of the reserve account has been built up by excessive annual allowances for depreciation charged to operating expenses."

It is apparent that charges for maintenance and for depreciation are interrelated. If by virtue of maintenance charges the plant is kept at a high state of efficiency the depreciation

charge should be less.  If, on the other hand, the amounts charged to maintenance do not maintain the plant in a high state of efficiency more charges must be made on account of retirements, and the depreciation charge should be higher. In this case we are confronted by the fact that the commission order not only required the rates charged to patrons to be reduced but cut down the depreciation rate from 4.53% claimed by the company to 3.41% composite.  On the basis of the authorities already cited, it is considered that the commission was in error in applying to the cost of reproduction new a depreciation charge of 28.47%.  No one denies that the plant is now approximately 90% efficient.

The so-called hidden or unobservable depreciation which is the basis of the witness Colbert's conclusions does not in fact appear in the history of this company as disclosed by the records in this case and in the *Lindheimer Case, supra.*  While the theory that it exists is plausible, there is no evidence that it has any bearing upon the life of the plant taken as a whole. A telephone plant such as the one under consideration never approaches the condition of the one-horse shay.  Whether in view of the fact that the company's plant has consistently been maintained at approximately 90% of full efficiency although having an average age of eight years, and at the same time the large depreciation fund heretofore indicated has been accumulated, indicates that the charges for annual depreciation are too high is quite another matter and one that will receive attention in the depreciation case determined herewith, *post,* p. 371, 287 N. W. 167.

The trial court was required to decide whether the amount of accrued depreciation should be determined by observation or upon a theoretical basis in accordance with the evidence given by the witness Colbert.  It is considered that the trial court in accordance with the great weight of authority correctly found that observed depreciation should be charged against the cost of reproduction new to ascertain the present

fair value of the plant. For analysis of the cases cited and other cases, see 36 Columbia Law Review, 250, 255–262. No testimony was offered to dispute that offered by the company as to the depreciation of the plant on the basis of observation.

Whether the depreciation charge was properly reduced will be considered in connection with the so-called depreciation rate case. We adopt the decisions of the supreme court of the United States because while confiscation is not the issue here, the result here is subject to review by the supreme court of the United States if it be alleged that it is confiscatory. In the *Lindheimer Case, supra,* the court was not dealing with accrued depreciation but the depreciation-reserve account. It found the amount in that account so large that it would not say the rate established was confiscatory.

## Excess Plant.

The company being entitled to earn only upon so much of its property as is used and useful in rendering the service for which charge is made, the question arises to what extent, if at all, is the company's plant overbuilt. The commission's engineer Hill found that 8% of the company's plant was not used and useful, or as he styled it, it had 8% excess plant,— $4,241,508. The company's engineer on the other hand found the value of excess plant to be $117,972. The commission's engineer Hill's compilations were based upon the years 1932 and 1933, which marked the bottom of the so-called depression, and the time when the use of the plant by the public was at its lowest. Apparently on the basis of partial inspection of the plant, Mr. Hill arrived at the conclusion that 8% of the plant was not used and useful because at the time of his inspection it was not actually in service or would not be in service within a reasonable time. There is no contention made that the company had overextended its plant on the basis of its prior experience. What the com-

pany had failed to do was to foresee the length and depth of the depression. The difference between the position of the company and that of the commission is to some extent a difference based upon a proposition of law. The company's position as stated by the commission is as follows:

"It is our position that the plant we have is to be valued. That is, not to have deductions because of claimed nonusefulness. If the plant was reasonably and properly necessary when put in, and that is what reasonably and properly necessary when put in means, which I could have elaborated. That is what we have tried to compress into the words 'prudent investment.' The phrase of what is reasonably and properly provided at the time is intended to be opposed to the concept of what is extravagantly and wastefully provided, if anything. It is our idea that the only plant that should be taken out of our reproduction-cost valuation because of the used and useful theory is that plant, if any, which was extravagantly and wastefully and recklessly provided. In other words, imprudently provided. And if there is any such plant and also such plant if there is some which was provided and in the ordinary course of changes becomes not only temporarily nonused but completely and permanently nonused, on which in the normal course of events there will be a removal when it is economical to remove. There is always such plant and that we have deducted in our valuation."

The commission was of the opinion that this was not good law, and cites *St. Joseph Stock Yards Co. v. United States* (D. C. 1935), 11 Fed. Supp. 322, 329, quoting as follows:

"The matter of including or excluding land or property held for business expansion in the rate base is the matter of who—the ratepayers or the company—shall carry property which is not being used to produce the service paid for by the rate. Obviously, it may be proper and good business judgment may sometimes dictate provision for future expansion of the business. It is equally clear that, so far as the present ratepayers are concerned, there must be a limit to the extent to which they can be compelled to pay for providing possible future facilities for future business. While a broad power and discretion must be left undisturbed in company manage-

ment, yet, even as to expenditures directly entering into the present service for which the now customer pays, this discretion is not beyond control. . . . Clearly, courts should somewhat critically examine values which do not enter into furnishing the service paid for, and there should be no presumption in favor of including them in the rate base. The burden is upon the company to show that such inclusion is proper. That showing must be that the properties held for future expansion are in themselves adaptable to such expansion and that there is probable need of them for that purpose in the not too distant future."

In the final order the commission points out some discrepancies in the claims of the company, and that the amount of not used and useful property found by the company's engineers was under any theory incorrect. Conceding that, there still remains the question upon what basis excess plant should be ascertained. In this connection it should be remembered that a public utility is required to furnish service when and as demanded by the public. It may not as a private enterprise may do upon the basis of probable future advantages, choose a time for the enlargement of its plant. Being compelled to provide service when and as demanded it must have some latitude with respect to plant enlargement. We think some misconception is likely to arise by considering the rights of past ratepayers, present ratepayers, and future ratepayers. The ratepayers are the public, and it is the public which demands the service. The public does not change. It is a constant factor and one which the company must at all times take into consideration. The individual ratepayer determines for himself the value of the service rendered to him. If he thinks it is not worth what is charged he does not use it. The question—whether the service rendered by the company to the public is rendered at a greater charge than is just and reasonable—is a different question, and is controlled by wholly different considerations. It is considered that even under the doctrine of the *St. Joseph Stock Yards Co. Case,*

11 Fed. Supp. 322, 329, property should not be excluded from the appraisal merely because at the moment the appraisal is made it is not in actual service. The injustice involved in such an appraisal is well illustrated by the experience of the company in this case.

In 1937 the commission caused one of its staff engineers, Mr. Nicholson, to take Hill's list of nonuseful property and determine what proportion of it was in use in 1937. Adopting Hill's material so far as possible, Nicholson found that approximately 42½% of the property Hill classed as nonuseful was already in use. The trial court found that the witness Hill's conclusions are in part based upon the following illegal grounds and upon alleged facts which have no foundation in fact:

"(1) In many instances, instead of giving consideration to the property as it existed, Hill estimated excess property on the basis of a substituted plant of his design.

"(2) By classifying and including a great deal of cable and conduit as nonuseful when the cable and conduit so classified and included had been and still was in active use at that time.

"(3) By classifying and including as nonuseful, thousands of left in stations when such stations had been installed on actual demand of subscribers and had been used by them and had been disconnected because of the depression. That thousands of such stations have since been reconnected and are now in use.

"(4) By arbitrarily allowing an insufficient amount of plant for spare capacity in switchboard and other central office equipment.

"(5) By improperly treating certain acquired land as excess.

"(6) By arbitrarily classifying and including certain portions of building as nonuseful when such portions had been necessarily used and were still being so used.

"(7) By improperly including and classifying property as nonuseful without knowing or giving consideration to the conditions or reasons existing for its acquisition or installation.

"(8) By improperly including and classifying as nonuseful, parts of certain buildings and certain drop wires, which had theretofore been taken off the books of the plaintiff and are not included in its inventory.

"(9) By improperly including and classifying the Wright street conduit as nonused and nonuseful."

While we cannot adopt the view of the trial court with respect to the testimony given by the witness Hill in its entirety, a reading of the record convinces us that it is so unfair and biased as to be unreliable. Nor does the attitude of the commission with respect to this issue meet with our entire approval. The commission said:

"The fact remains that our engineer Hill has made the only engineering investigation of property not used and useful which has been conducted in this case. The company's shallow revelation that there is a trivial quantity of defunct property which is being or has been taken off the books, is not a scientific inquiry into the property actually used and useful under physical conditions now existing. Hill, on the contrary, has embraced his initial studies in two volumes which include hundreds of pages of minute detail."

On the other hand, the company contends that the witness Hill—

"was, in the greater part of his testimony, ready to be and often was untruthful and shifty and constantly alert to say anything necessary to support any testimony or figures he had presented."

Neither side seems to have maintained entire objectivity with reference to the matter of excess plant. The contest between the commission and the company resembles in some of its aspects a contest between adversary lawyers rather than a discussion in proceedings before a *quasi*-judicial tribunal.

Hill apparently went over the plant with meticulous care for the purpose of discovering every item of property not in use. He gave no consideration to the conditions under which

it was installed, cut probable future use to the bone, and in many instances substituted his judgment for that of the management without ascertaining whether the management had acted improvidently. He, in effect, revamped the property in the light of experience instead of considering the propriety of the additions as of the time they were made. Nevertheless a consideration of the whole record convinces us that there is more excess plant than was found by the trial court or disclosed by the report of the company's engineer.

We are unable to say from the record just how much of this excess plant there is. It appears that Hill's estimate was 40% wrong by actual inspection in 1937. Considering the method adopted by him which practically disregarded everything except future probable use, which was reduced to a minimum, his whole estimate becomes unreliable, and does not sustain the conclusions he reached. We cannot make a complete analysis of his testimony but refer to the following as illustrating his method: It was his view that vertical sections of buildings, even though they housed cafeterias, boilers, and power plants in actual use, should be classed as excess plant on the theory that this equipment could be located in other buildings, thus making a part of the buildings not useful. Where two cables were run side by side, each in use to the extent of 30% instead of 60% which Hill considered appropriate, he would class one of the cables as nonuseful on the theory that the customers attached thereto could be shifted to the other cable. In this connection it should be noted that neither the commission nor its engineers took the position that the plant was overbuilt or improvidently or wastefully provided. The commission was apparently of the view that it was not required to take into consideration conditions existing at the time the so-called excess plant was installed.

Not every chance remark made by a court in commenting upon the facts of a particular case should be construed into a

rule of law applicable to all other cases. If utilities are to be accorded the right to manage their own properties some effect must be given to their judgment in the acquirement and installation of their equipment.

The commission interprets the law stated in the *St. Joseph Stock Yards Co. Case,* 11 Fed. Supp. 322, 329, to mean that all property should be excluded from the rate base which is not in actual use plus a reasonable tolerance for the future. The commission said:

"We believe that the test is: Would we reproduce one thousand pieces of plant if we actually need only five hundred now, no matter how prudent it may have been at the time of original investment to invest in the one thousand? It seems to us that there can be but one answer, and that is that the five hundred, with a reasonable tolerance for a reasonable time in the future, represents the property used and useful.

"We do not deny that ample provision of spare plant is required in a telephone company to guarantee continuity and adequacy of telephone service, but there appears to be no justification for including in the rate-base value large quantities of property which have been superseded through improvements in the art and rearrangement of plant to conform to the growth of communities, and further quantities of plant which will come into use, if at all, in the far distant future. . . .

"Furthermore, we regard it as unreasonable to say that property becomes used and useful because of its capacity to handle a load unprecedented over a number of years. Common sense demands that some subscribers shall suffer slight delay in service during an acute emergency rather than that all subscribers shall pay perpetually for an excess of property only occasionally in use under extreme conditions."

If the theory of the commission is sound then rates are to be constructed on the basis of a remanagement of the property in the light of experience and present conditions. We do not so understand the law even where confiscation rather than reasonable rate is the issue. The company is entitled to

have the matter of excess plant determined on the basis of the existing plant which is being valued. The commission may not construct a hypothetical plant which would render an equivalent service or reconstruct in theory parts of the existing plant and on that basis hold that any provision in the existing plant over and above that found in the theoretical plant is excess plant, which seems to be substantially what was done in this case. This gives no effect to the broad discretion vested in the management. In making its determination in this case the commission substituted the discretion of the witness for that of the managers of the property without in any way impeaching the discretion of the managers. It is much easier to point out past errors in management than it is to avoid future mistakes. A reasonable rate is one based on reason as applied to the property of the utility. While the company must bear the burden of an unreasonable extension of its plant, and the risk that portions of it prudently acquired may become obsolete or not useful, it should not be penalized for failure exactly to anticipate future demands for service in a period of depression. After careful consideration we are of the view that the amount of excess plant does not at the most exceed 2%.

## WESTERN ELECTRIC PRICES.

In the making of the appraisal the commission and the company applied Western Electric prices. This appears to have been done for the reason that the proof showed that Western Electric prices were at all times lower than competitive prices in the industry. The controversy is affected by the fact that the capital stock of the Wisconsin Telephone Company, except qualifying shares, is owned by the American Telegraph & Telephone Company. The American Telegraph & Telephone Company also owns the Western Electric Company. It appears from the evidence that the Western

Electric Company is in fact the manufacturing department of the American Telegraph & Telephone Company. The fact that the company bought its equipment and supplies from an affiliated company, both being subject to the control of the American Telegraph & Telephone Company, naturally suggests that the transactions between the two companies should be subjected to close scrutiny. The attitude of the commission in this matter seems to be based upon a statement made in *Smith v. Illinois Bell Tel. Co.* (1930) 282 U. S. 133, 152, 51 Sup. Ct. 65, 75 L. Ed. 255. The situation in that case with respect to affiliated companies was the same as the situation in this case. The supreme court of the United States said:

"On the record in this suit, the [trial] court concluded that the city had failed to support its contention that these prices were exorbitant. The court said that it appeared that for the past fourteen years the average profit of the Western Electric Company on its total business had not been 'in excess of seven per cent and never above ten per cent.' That fact has evidentiary value but the finding does not go far enough. The Western Electric Company not only manufactured apparatus for the licensees of the Bell system but engaged in other large operations and it cannot be merely assumed or conjectured that the net earnings on the entire business represent the net earnings from the sales to the Bell licensees generally or from those to the Illinois company. Nor is the argument of the appellants answered by a mere comparison of the prices charged by the Western Electric Company to the Illinois company with the higher prices charged by other manufacturers for comparable material, or by the Western Electric Company to independent telephone companies. The point of the appellants' contention is that the Western Electric Company, through the organization and control of the American company [A. T. & T. Co.], occupied a special position with particular advantages in relation to the manufacture and sale of equipment to the licensees of the Bell system, including the Illinois company, that is, that it was virtually the manufacturing department for that system, and the question is as to the net earnings of the

Western Electric Company realized in that department and the extent to which, if at all, such profit figures in the estimates upon which the charge of confiscation is predicated. We think that there should be findings upon this point."

The commission evidently interpreted this statement as a rule of law whereas the supreme court of the United States was merely stating a basis upon which further consideration of the case should be had upon its remand to the lower court. The court laid down a procedure to be followed upon a reconsideration of the case. If an investigation should show that the prices charged by the Western Electric Company to the Wisconsin Telephone Company or any other subsidiary of the American Telegraph & Telephone Company were exorbitant or unreasonable to the detriment of the public interest, certain legal consequences would follow.

The commission in this case, acting upon the statement quoted, proceeded to make a superficial analysis of the Western Electric Company's business. It said:

"The only way to find out whether the price of a particular article is reasonable is to find out what the cost is to manufacture and sell that article."

We have the word of an eminent economist that this is not sound economics. 1 Bonbright, Valuation of Property, p. 155, says:

"For all modern economists, even those who remain loyal to the orthodox theories of price determination, agree that production costs are very unreliable measures of value. Marshall's statement that 'cost of reproduction exerts little direct influence on value, save when purchasers can conveniently wait for the production of new supplies,' would be generally accepted in the profession."

The commission seems to be of the view that in determining whether or not a reasonable price was paid for the products of the Western Electric Company, it was still valuing company property. As a matter of fact it was dealing with

property which was bought and sold upon the open market. Certainly, in a shifting market, cost of manufacture would be a dubious guide in the ascertainment of price.

In this case, as in other instances throughout the trial, the commission rested its decision upon generalizations based upon general economic considerations instead of upon the facts of the particular case. It said:

"Here again is the effect of economic disaster [referring to condition of the Western Electric Company]. A vast industry, carrying enormous overheads and no business to sustain it, increases its prices. But by that fiat it cannot stamp those increases as reasonable, nor should such increases, propelled by the flight of business from the Western company, arbitrarily inflate the 'fair value' of operating company property through the country."

In concluding this part of its consideration, the commission said:

"The 1929 equipment and material prices as quoted in Western Electric Company price lists have been adopted by the commission engineers as the best available prices corresponding to large volume production by the Western Electric Company."

The difference, amounting to $3,700,000 as found by the court and by the commission, results from the fact that the commission's engineer applied 1929 Western Electric Company prices as to part and 1934 Western Electric prices as to other parts of the equipment. Just how a plant could be reproduced in 1934 upon the basis of 1929 prices is difficult to see. It was apparently based upon the testimony of the witness Hill, who was of the opinion that 1929 Western Electric equipment prices represented the fairest estimate of the 1932–1935 cost level. Hill's explanation was as follows:

"I have taken the point of view that the Western Electric Company is the manufacturing department of the Bell system and as such is the manufacturing department of the Wisconsin Telephone Company; that excess or not used and

useful manufacturing facilities of the Western Electric Company, which would be the cause of high manufacturing costs, if there were but a small volume of production, are in the same class as excess plant and property of the Wisconsin Telephone Company; that the material prices which are suitable and proper for use in a reproduction-cost estimate of the Wisconsin Telephone Company are the material prices which would result from the operations of a well-constructed, well-organized factory of size and organization properly adapted to the current volume of output. 1929 was the last year in which the plant and organization of the Western Electric Company might have been reasonably well adjusted to its volume of output at that time. Consequently, I have used the 1929 prices as the best measure available to me at the present time of the normal cost of manufacture in a well-organized, well-equipped plant of the proper size."

It is evident that Mr. Hill did not adopt the procedure suggested by the supreme court of the United States in *Smith v. Illinois Bell Tel. Co., supra.* He adopted the 1929 prices because in his opinion it constituted in 1932 and 1933 the normal cost of manufacture in a well-organized, well-equipped plant of the proper size. We assume that he included in "normal cost" a reasonable profit.

It was not contemplated by the supreme court of the United States in *Smith v. Illinois Bell Tel. Co., supra,* that fair price should be ascertained on the basis of a theoretical plant adapted as to volume to the particular needs of a particular year. This being true, the testimony of Mr. Hill furnished no basis whatever for resorting to 1929 prices. His testimony furnished no basis for the conclusion that Western Electric products were sold to the company at exorbitant rates. The only remaining basis upon which the prices could be established was the state of the open market, and it is conceded that the Western Electric prices during all the years in question were lower than those of its competitors in this market.

It is considered that the trial court's finding that $3,700,000 should be added to Hill's appraisal of reproduction cost new

as adjusted by the commission because of the use of 1929 instead of 1934 Western Electric prices is correct.

## INTEREST DURING CONSTRUCTION.

It is the contention of the company that approximately $1,500,000 should be added to the appraisal by the commission on account of interest during construction. There is no disagreement with respect to the addition of interest. The controversy relates to the amount to be added. The company contends that approximately $3,500,000 should be added while the witness Hill estimates the amount of $2,000,000, while the witness Cook estimates the amount of $2,500,000 based on the Crowell appraisal, which amounts to about $2,000,000 based on the commission's valuation. The commission allowed approximately $2,000,000.

In considering this matter the trial court said:

"On this issue the plaintiff produced the testimony of its chief engineer Crowell, who met this problem by cutting off interest on fifty per cent of the exchange when fifty per cent of the telephones of that exchange were prepared to be given service, at which time an exchange would be opened for business for the first time. Thereafter he cut off interest in proportion to the value of groups of telephones as such groups of telephones were given service. This cut off of interest was done from time to time on groups of telephones instead of on each telephone as each telephone was cut in, in order to avoid interminable calculations. The number in such groups of telephones depending on the attending conditions. By the use of such formula he arrived at 9.42 months time as the construction period, and at approximately $3,500,000 as interest allowance. The plaintiff also produced Maynard A. Cook of the firm of Sloan & Cook, consulting engineers of Chicago, Illinois. He used a different formula than did Crowell and arrived at a 6.6 months time as the construction period, and at approximately $2,000,000 as interest. However, under the formula used by him he designated about $1,900,000 additional interest to going value. Under his formula he stopped interest, as such, after the initial cut in, and the amounts which Crowell continued

to include as interest after the initial cut in of fifty per cent of the exchange, Cook designated as going value. The result then being that Cook in fact allowed more for interest than did Crowell, but designated part of it as going value. Crowell designated it all as interest and made a separate and independent appraisal of going value elsewhere.

"Cyrus G. Hill, the commission's engineer, arrived at 6.84 months time as the construction period, and at approximately $2,000,000 as interest. He used the same formula used by Cook and stated, as did Cook, that a part of what Crowell had included as interest belongs in an appraisal but should be included as going value. However, Hill testified that the commission had not requested him to make an appraisal of going value, and that he had not included going value in his appraisal anywhere.

"In its final order the commission states: 'We therefore find that the amount of interest determined by the commission's staff of approximately $2,000,000, which is about the same as calculated by the company employed engineer Cook, when related to the commission's valuation, is the absolute maximum amount which could be allowed as interest during construction.'

"This court is unable to find any basis in the record for the assumptions made in the foregoing quotation. The premise being false and erroneous, any conclusions based thereon must be similarly considered."

The question seems to involve a matter of classification. Should certain estimates properly be included as interest during construction or as going value? The witness Hill and the witness Cook classified $2,000,000 as interest and the remainder as going value while the witness Crowell attributed the whole amount to interest. There seems to be no disagreement that on some basis a sum in excess of $2,000,000 should be added to the appraisal. No consideration seems to have been given to this item by the commission in establishing going value. In respect to going value the commission said:

"We have valued the property of the company after giving consideration to the fact that the company is a going concern

and to book investment and values which include costs of training the organization of the company and of developing routines, practices, and records to the extent that such items enter into the cost of telephone plant. We believe this gives full consideration to the element of going value and that no separate additional allowance is warranted by the facts."

It is apparent that in determining going value the commission gave no consideration to the interest element. On the basis of this determination it is considered that the trial court rightly added to the appraisal $1,061,036 for additional interest.

At this point we digress for the purpose of expressing some views with reference to valuation of public-utility properties. While the commission said that it gave and there is no reason to suppose it did not give consideration to book investment, the whole emphasis throughout this valuation proceeding covering a period of nearly five years has been placed upon the cost of reproduction new. When *Smyth v. Ames, supra,* was decided in 1898, public utilities were subject to little, if any, effective regulation. In the financial structure of utility companies, especially railway companies, was to be found a large amount of so-called water. There was no systematized accounting and it was practically impossible to discover from the records of a utility company the so-called book cost of the property. There was therefore no other practical way to ascertain its value than to consider what it would cost to reproduce it new, and then depreciate that cost to the present condition of the plant being valued. Here we have a plant which has been under state supervision since 1911, and under federal supervision since 1913, has been required annually or oftener to report to regulating authorities every dollar of its earnings and expenditures and at all times it has been subject to strict supervision as well as regulation. Just why a million and a half to two million dollars should be spent in appraising a hypothetical plant that would never be built, under assumed conditions that never

can exist, on the basis of price levels which are mere esti-
mates, by a construction force which must be hypothetical,
and then assume that that represents the fair value of the
plant and give it controlling weight as against the book costs
which are disclosed by records kept under strict governmental
supervision, is difficult to see. We expressed dissatisfaction
with the emphasis placed upon reproduction new in valuing
the property of public utilities in *Waukesha Gas & E. Co. v.
Railroad Comm.* (1923) 181 Wis. 281, 194 N. W. 846.
There is considerable evidence that it will ultimately cease
to be a dominant factor in utility-valuation practice in cases
where other more accurate and realistic bases are available.

In a dissenting opinion by Mr. Justice BRANDEIS, in which
Mr. Justice HOLMES concurred, in *Missouri ex rel. South-
western Bell Tel. Co. v. Public Service Comm.* (1923) 262
U. S. 276, 299, 43 Sup. Ct. 544, 67 L. Ed. 981, it is said:

"Thus, for some time, replacement cost, on the basis of
prices prevailing at the date of the valuation, was often
adopted by state commissions as the standard for fixing the
rate base. But gradually it came to be realized that the defi-
niteness of the engineer's calculations was delusive; that they
rested upon shifting theories; and that their estimates varied
so widely as to intensify, rather than to allay doubts. When
the price levels had risen largely, and estimates of replace-
ment cost indicated values much greater than the actual cost
of installation, many commissions refused to consider valu-
able what one declared to be assumptions based on things
that never happened and estimates requiring the projection
of the engineer's imagination into the future and methods of
construction and installation that have never been and never
will be adopted by sane men. . . . And state utility commis-
sions, while admitting the evidence in obedience to *Smyth v.
Ames,* failed, in ever-increasing numbers, to pay heed to it in
fixing the rate base."

See also concurring opinion by Mr. Justice BRANDEIS, in
which Justices STONE and CARDOZO joined, *St. Joseph Stock*

*Yards Co. v. United States,* 298 U. S. 38, 73, 56 Sup. Ct. 720, 80 L. Ed. 1033.

See also concurring opinion, Mr. Justice FRANKFURTER, *Driscoll v. Edison Light & Power Co.* (1939) 307 U. S. 104, 59 Sup. Ct. 715, 83 L. Ed. 1134.

In *West v. Chesapeake & P. Tel. Co.* (1935) 295 U. S. 662, 689, 55 Sup. Ct. 894, 79 L. Ed. 1640, Mr. Justice STONE dissenting (Justices BRANDEIS and CARDOZO concurring), said:

"In assuming the task of determining judicially the present fair replacement value of the vast properties of public utilities, courts have been projected into the most speculative undertaking imposed upon them in the entire history of English jurisprudence. Precluded from consideration of the unregulated earning capacity of the utility, they must find the present theoretical value of a complex property, built up by gradual accretions through long periods of years. Such a property has no market value, because there is no market in which it is bought and sold. Market value would not be acceptable, in any event, because it would plainly be determined by estimates of future regulated earnings. Estimates of its value, including the items of 'overheads' and 'going concern value,' cannot be tested by any actual sale or by the actual present cost of constructing and assembling the property under competitive conditions. Public-utility properties are not thus created full fledged at a single stroke. If it were to be presently rebuilt in its entirety, in all probability it would not be constructed in its present form. When we arrive at a theoretical value based upon such uncertain and fugitive data we gain at best only an illusory certainty. No court can evolve from its inner consciousness the answer to the question whether the illusion of certainty will invariably be better supported by a study of the actual cost of the property adjusted to price trends, or by a study of the estimates of engineers based upon data which never have existed and never will."

In *West v. Chesapeake & P. Tel. Co., supra,* the commission had arrived at a valuation by the application of price-

trend data to historical cost. The court held that such a method of valuation was inapt and improper and that an order fixing rates on that basis was repugnant to due process of law. The court said (p. 271) :

"To an extent value must be a matter of sound judgment, involving fact data. To substitute for such factors as historical cost and cost of reproduction, a 'translator' of dollar value obtained by the use of price-trend indices, serves only to confuse the problem and to increase its difficulty, and may well lead to results anything but accurate and fair. This is not to suggest that price trends are to be disregarded; quite the contrary is true. And evidence of such trends is to be considered with all other relevant factors."

This would seem to imply that no valuation made without an appraisal and ascertainment of cost of reproduction could stand. The court in the *West Case, supra,* criticized the data used by the commission in its valuation rather severely. We have found no comparable criticism of the reproduction or replacement bases of valuation although it seems to be equally vulnerable in that regard. While we adhere to the rule laid down by the supreme court of the United States it is difficult to see why a valuation arrived at by guess on the basis of estimates should form the legal basis for depriving a litigant of its property, or be the justification for excessive charges to the public. In this connection see 37 Mich. Law Review, 1209, The Rate Base, by Paul G. Kauper, where the authorities are cited and the problem carefully analyzed.

## Toll Segregation.

Prior to the issuance of the final order in this case the commission had considered that the local telephone charge should cover the cost of service to the toll switchboard, and the charge for toll service should cover the service from toll switchboard to toll switchboard. The exchange plant therefore was considered to be that part of the plant employed in local service and in the extension of service to the toll switch-

board. In its order in this case the commission excluded from the rate base the value of the so-called terminal toll plant which had theretofore been considered a part of the exchange plant, and allocated 7.4% of the plant value to toll, but made no provision for a change in toll rates so that the company, although the value of the toll plant is excluded from the rate base, is now required to provide for the expense of operating and maintaining a toll plant out of exchange revenue. In this connection it should be pointed out that in three cases where the commission had this matter directly before it, the last one being *In the Matter of the Application of Wisconsin Telephone Company* for authority to increase its rates at its Marinette exchange, 34 W. R. C. R. 223, decided January 3, 1931, the commission itself held that the former method of accounting was correct. We quote rather extensively because it discloses the nature of the controversy:

"However, the present method of accounting has been examined and approved by the commission in the past and we can see no occasion for a change. Under the present method the fixed rental of the local subscriber is just what it would be if his local exchange were isolated and he has the advantage of knowing that, if occasion should arise, he can call distant points, at no additional cost except as he uses the toll service. If, as the city advocates, a proportion of the toll revenue were credited to the local exchange this would have to be done for all exchanges in the state and, since the toll system does not show excessive earnings, there would then be two alternatives. One would be to assess against each local exchange a corresponding proportion of the investment and expenses of the toll system which would nullify the benefit of the additional revenue. The other would be to increase the toll rates and if this were equitably done it would increase the toll revenue from a given exchange by the same amount as was credited to it. Neither alternative would reduce the total burden to be borne by the subscribers of the exchange in question but at the most only shift a larger proportion onto the subscribers actually using toll service. Since, as pointed out above, these subscribers are already carrying the costs of the toll system in addition to paying their share of the local

exchange costs, while the subscribers not using the toll system have, at no cost, the advantage of the right of being connected to it, such a shift would be uncalled for."

Upon the strength of the ruling of the commission, the company has made contracts for the use of its toll lines upon that basis with some two hundred nineteen other companies. No doubt it is within the power of the commission to make such classifications and allocations as it finds proper and necessary, but the result of the final order with respect to terminal toll property is so manifestly unfair and unjust that we are of the view that it could only have resulted from a mistake of law. The commission said:

"We dispose of the question of terminal toll, as a matter of law, under the *Smith Case,* as we understand it." (*Smith v. Illinois Bell Tel. Co.* (1930) 282 U. S. 133, 150, 51 Sup. Ct. 65, 75 L. Ed. 255.)

It stated its position as follows:

"Exchange subscribers cannot be required to bear in exchange rates the burden of carrying the facilities from the subscriber's station to the toll board. This is toll service. The supreme court expressly said that the exchange subscriber could not be thus imposed upon with such a burden on interstate toll calls. The logic is the same, whether interstate or intrastate toll is involved. The access to the toll board is toll on an intrastate call as much as on an interstate call. If it is not exchange service on an interstate call (and the supreme court certainly said so), then it is not exchange service on an intrastate call."

The trial court could find no warrant in *Smith v. Illinois Bell Tel. Co., supra,* for the conclusions reached by the commission. Neither do we. In the first place, the commission has power to regulate intrastate toll rates. That is expressly so provided in sec. 221 (b) of the Federal Communications Act of 1934, 47 USCA, § 221 (b).

In *Smith v. Illinois Bell Tel. Co., supra,* the court said
(p. 146):

"At the threshold of the discussion, we are met with the
fact that, in these findings, the commission and the court
made no distinction between the intrastate and the interstate
property and business of the company. It appears that the
property of the company in Chicago is used to render (1)
what is called exchange service, all of which is intrastate,
(2) intrastate toll service over its own lines and under ar-
rangements with companies other than the American com-
pany, and (3) interstate toll service, which includes all the
toll service rendered under arrangements with the American
company. The company introduced evidence separating the
intrastate and interstate business and also the intrastate ex-
change business. While the court regarded these computa-
tions as correct, and approved the method in which they had
been made, still the court made no specific findings based on
a separation of the intrastate and *interstate property, reve-
nues and expenses,* but determined the issue on the basis of
the total Chicago property of the company.

"The court stated that this was done because that basis was
less favorable to the company than that of its total intrastate
property or of its intrastate exchange property. . . . Con-
sidering that the difference would not affect the result, the
court deemed it to be more convenient to pass upon the order
of the commission without recasting the figures in order to
make allowance for interstate or intrastate toll property and
earnings. . . .

"In the method used by the Illinois company in separating
its interstate and intrastate business, for the purpose of the
computations which were submitted to the court, what is
called exchange property, that is, the property used at the
subscriber's station and from that station to the toll switch-
board, or to the toll trunk lines, was attributed entirely to the
intrastate service. This method was adopted as a matter of
convenience, in view of the practical difficulty of dividing the
property between the interstate and intrastate services. The
appellants [commission] insist that this method is erroneous,
and they point to the undisputable fact that the subscriber's
station, and the other facilities of the Illinois company which

are used in connecting with the long-distance toll board, are employed in the interstate transmission and reception of messages. While the difficulty in making an exact apportionment of the property is apparent, and extreme nicety is not required, only reasonable measures being essential [citing cases] it is quite another matter to ignore altogether the actual uses to which the property is put. It is obvious that, unless an apportionment is made, the intrastate service to which the exchange property is allocated will bear an undue burden—to what extent is a matter of controversy. We think that this subject requires further consideration, to the end that by some practical method the different uses of the property may be recognized and the return properly attributable to the intrastate service may be ascertained accordingly."

What the supreme court of the United States was doing was to require interstate business to be separated from intrastate business. It said nothing whatever about the allocation of revenues as between exchange and intrastate toll service. The commission in its final order says:

"The supreme court of the United States in the *Smith Case* refers to the 'indisputable fact that the subscriber's station, and the other facilities of the Illinois company which are used in connecting with the long-distance toll board, are employed in the interstate transmission and reception of messages.' This can mean only one thing, namely, that the segment between a subscriber's station and the toll board on a call from Madison to Chicago is interstate commerce. By the identical token, that identical segment is a part of *any* toll, albeit intrastate toll."

We think this is a misinterpretation of what the supreme court of the United States said. The supreme court did not say that the exchange subscriber might not be charged as a part of the exchange rate for the transmission of a message from his station to the toll board. What the supreme court said was that the intrastate business could not be made to bear a part of the expense fairly attributable to interstate business. The equipment between the subscriber's station and the switchboard is used for both interstate and intrastate

business. From the order it is clear that the commission proceeded upon what it supposed to be a rule of law established by the supreme court of the United States. The supreme court of the United States did not concern itself with the basis upon which intrastate rates should be determined, provided they were compensatory. It stated the reason for the segregation as follows (p. 148):

"The separation of the intrastate and interstate property, revenues and expenses of the company is important not simply as a theoretical allocation to two branches of the business. *It is essential to the appropriate recognition of the competent governmental authority in each field of regulation.* In disregarding the distinction between the interstate and intrastate business of the company, the court found it necessary to pass upon the fairness of the division of interstate tolls between the American and Illinois companies. The court held that the division was reasonable and the appellants contest this ruling. But the interstate tolls are the rates applicable to interstate commerce, and neither these interstate rates nor the division of the revenue arising from interstate rates was a matter for the determination either of the Illinois commission or of the court in dealing with the order of that commission."

The law relating to the segregation of intrastate from interstate tolls does not control the action of the commission in making intrastate allocations of exchange and toll property.

The commission also intimates that although it has segregated the toll property and so denied the company the right to earn upon it and has allocated the expense and has made no provision for revenue, that the remedy of the company is by petition to have its toll rates increased; that the commission is considering only exchange rates. The company complains and says with reason that if that was the case it was not made aware of it until the issuance of the final order. It is to be remembered that this proceeding was initiated by the commission upon its own motion. It ordered:

"That an investigation and inquiry be, and the same is hereby instituted on the commission's own motion into the

rates, charges, tolls, rules, service, practices, and activities of the Wisconsin Telephone Company."

The company says that until the final order was issued it had no means of knowing definitely when or how the toll service would be dealt with. We are not advised when or how the proceeding became a local-exchange-rate proceeding. Certainly toll rates were within the scope of the commission's order which initiated the proceeding. In its order for investigation the commission referred to a similar proceeding in the state of New York. The commission in its order said:

"We believe that the state-wide plan is the sounder theory of telephone rate-making and it is the plan which we propose to follow in this investigation. . . .

"Perhaps the most notable instance of a state-wide telephone investigation was that instituted by the New York public service commission in 1921," and the commission quoted, among other things, the following:

"The amount of revenue necessary can then be obtained by rates (in the state-wide case) which are uniform, under like circumstances and conditions, instead of through hundreds of separate rates and classifications for the same character of service, with the consequent discrimination and undue preference. Both toll and exchange rates can be so fixed and toll service costs and returns determined on a proper and sound basis."

The basis of the New York proceeding is set out in the 1931 order of the commission at length and clearly contemplates the investigation of all the property owned by the Wisconsin Telephone Company within the state of Wisconsin and all of the rates, tolls, and charges of the company.

If the commission in segregating toll property from exchange property had made a corresponding allocation of revenues, the final result would not have been materially affected, but when it failed to make any allocation of revenues or other provision for the expense of maintaining and operating what is now classified as toll property, it threw that expense back upon exchange revenues and cut the rate base by the

amount of property allocated to toll. It did this upon authority of *Smith v. Illinois Bell Tel. Co., supra,* erroneously. The amount of the terminal toll segregation should be included in the rate base in accordance with its former decisions. We do not undertake to criticize the commission's classification. When, however, it changes its classification it should be consistent. It would seem to a nonexpert that the exchange subscriber is subject to a reasonable "ready to serve" charge. Although he may never use it, the intrastate as well as the interstate toll property is maintained for his use.

## CONCLUSION.

Our consideration of the questions relating to rate base results in the following:

Hill's appraisal of reproduction cost new as
adjusted by the commission..............$53,018,854
Add:
Difference due to use of 1929
   instead of 1934 prices......$3,700,000
Interest not included by the
   commission or added to going
   value ................... 1,061,036    4,761,036

                             $57,779,890
Less:
2% excess plant.............$1,155,597
Accrued depreciation 9.79%... 5,656,651
Interstate allocation.......... 288,899    7,101,147

                             $50,678,743
Plus:
Working capital........................ 750,000
Intangibles including going value.......... 2,103,000

Rate base (round numbers $53,500,000)..$53,531,743

The commission found total exchange, adjusted net operating income for the year 1934 to be $1,656,358. On the rate base found by the trial court and modified by this court it

produces a return of 3.1%. On the rate base found by the commission it produces a return of 5%. It is clear that there is no ground for saying that the existing rates were unreasonable. Subsequent experience confirms this conclusion.

Income of the company as per company brief is as follows:

| | |
|---|---|
| 1936 | $2,687,319 |
| 1937 | 2,248,661 |
| 1938 | 2,374,959 |

Income of the company as adjusted by the commission:

| | |
|---|---|
| 1936 | |
| 1937 | $3,071,762 |
| 1938 | 2,786,660 |

In none of these years would the returns exceed 6% upon the base found by the court as modified.

The commission found upon the matter of fair return that 5½% under all the circumstances and conditions existing at the time the order was made was reasonable.

We shall not undertake to review the order of the commission in that respect. In this connection we call attention to *Driscoll v. Edison Light & Power Co.* (1939) 307 U. S. 104, 59 Sup. Ct. 715, 83 L. Ed. 1134. In considering the matter of rate of return in a case involving a public-utility corporation furnishing electric energy, the court said (p. 119):

"The rate of return was fixed by the commission at 6 per cent. Witnesses for the utility brought out facts deemed applicable in the determination of a proper rate of return on the fair value of the property. Their evidence took cognizance of the yield of bonds, preferred and common stocks of selected comparable utilities, the stagnant market for new issues, prevailing cost of money, the implications of the possible substitution of some governmentally operated or financed utilities for those privately owned and the dangers of a fixed schedule of rates in the face of possible inflation. From these factors they deduced that a proper rate of return would be from 7.8 per cent to 8 per cent. An accounting

expert of the commission countered with tables showing yields of bonds of utilities; the yield to maturity of Pennsylvania public-utility securities, approved by the commission between July 1, 1933, and May 7, 1937, long term and actually sold for cash to nonaffiliated interests; yield of Pennsylvania electric utilities; financial and operating statistics of Pennsylvania electric utilities; money rates, and other material information. He concluded 5.5 per cent was a reasonable rate of return.

"It must be recognized that each utility presents an individual problem. The answer does not lie alone in average yields of seemingly comparable securities or even in deductions drawn from recent sales of issues authorized by this same commission. Yields of preferred and common stocks are to be considered, as well as those of the funded debt. When bonds and preferred stocks of well-seasoned companies can be floated at low rates, the allowance of an over-all rate return of a modest percentage will bring handsome yields to the common stock. Certainly the yields of the equity issues must be larger than that for the underlying securities. In this instance, the utility operates in a stable community, accustomed to the use of electricity and close to the capital markets, with funds readily available for secure investment. Long operation and adequate records make forecasts of net operating revenues fairly certain. Under such circumstances a 6 per cent return after all allowable charges cannot be confiscatory."

The capital market in Pennsylvania certainly must be as favorable if not more favorable than the capital market in Wisconsin. While lower rates of fair return have been found in other cases, such cases are not a dependable guide because in many of them the court is considering the issue of confiscation which may involve other factors so that it cannot be said as a matter of law that it is necessary that the property produce some specified rate of return.

In *Wisconsin Gas & Electric Co. v. Tax Comm.* (1936) 221 Wis. 487, 266 N. W. 186, 268 N. W. 121, this court had under consideration the valuation by the Wisconsin tax commission of the property of the utility for tax purposes. In

that case we were required to consider what rate of return should be adopted for the purpose of capitalizing earnings. While that method cannot be used in valuing property of a utility for rate-making purposes, the rate of return must be considered in each case. This court approved the application of a rate of return of 6%. The court said (p. 498) :

"Plaintiff's claim that the proper rates of capitalization are seven, seven and one-half, and eight per cent, while the defendants in testing the validity of the commission's assessment have insisted upon the propriety of rates of five, five and one-half, and six per cent. We assume that the rate at which the earnings of a company are capitalized must bear a relation to the rate of return currently being derived from capital invested in other taxable property."

We shall not consider the so-called adjustments made in the expenses of the utility in order to establish net income. However, our failure to deal with these matters must not be construed as approval of the methods employed. In a general way, here as in consideration of the factors relating to the rate base, minimum figures are employed. No consideration is given to the fairness or justness of expenses actually incurred and made by the management; the expense account is cut down on the basis of a remanagement of the business. Where the management has not been extravagant, improvident, or wasteful it is considered that the commission may not ignore actual expenses because in the light of experience and present conditions it is possible to say that some part of the expense might have been avoided. From what has been said it follows that the judgment of the trial court in each case must be affirmed.

*By the Court.*—Judgment in each case is affirmed.

The following opinion was filed September 15, 1939:

Per Curiam (*on motion for rehearing*). The defendant has filed motions for rehearing and in connection therewith

a motion to modify the mandate in each case.  In its brief, in support of its motions, the defendant calls our attention to an obvious error in the opinion.  In the opinion it is said:

"The commission found total exchange, adjusted net operating income for the year 1934 to be $1,656,358.  On the rate base found by the trial court and modified by this court it produces a return of 3.1%.  On the rate base found by the commission it produces a return of 5%.  It is clear that there is no ground for saying that the existing rates were unreasonable.  Subsequent experience confirms this conclusion."

The adjusted net operating income for the year 1934 was in fact $2,951,834 as determined by the commission.  An error having been made in taking off the basic figure, the conclusions based thereon are also in error.  However, on the rate base found by the trial court and modified by this court, the net operating income for the year 1934 produces a return of only 5.5%, so that after the correction is made it still remains clear that there is no ground for saying that the existing rates are unreasonable.  We are cited to no authority and we find none holding that a return of 6% is an unreasonable return.  On the other hand, a return of less than 6% has in some cases been held to be not unreasonably low.  The statement made in the opinion is modified to conform to the corrections made here.

The second contention of the defendant is that the judgment of the circuit court in each case should be modified so that there shall be retained in the hands of the circuit court and subject to its disposition the funds required to be deposited by the plaintiff as a condition to staying the 1934 order and the final order.

The defendant relies upon the case of *United States v. Morgan* (1939), 307 U. S. 183, 59 Sup. Ct. 795, 83 L. Ed. 1211.  There are two reasons why the motion to modify the mandate in this respect must be denied.  First, we find no provision in the statutes which authorizes the public service

commission in a proceeding conducted in 1940 to fix a rate for the year 1934. If the judgment were to be modified as defendant claims it should be, that would be the practical result.

There is a second and more convincing reason. The order in the *Morgan Case* was not a tentative or temporary order,—it was a final order fixing rates for the future. As a condition of staying the order the district court required the stockyards operators to deposit the difference between the collected rate and the rate fixed by the order so that the patrons of the stockyards might be reimbursed if the secretary's order should ultimately be sustained. Upon an appeal to the supreme court of the United States, the judgment of the district court confirming the order of the secretary of agriculture was finally reversed on procedural grounds. *Morgan v. United States* (1938), 304 U. S. 1, 58 Sup. Ct. 773, 999, 82 L. Ed. 1129. The merits received no consideration.

The 1934 order was denominated a temporary order and fixed the rate "for the period of one year unless the commission shall in the meantime alter or amend this order." The commission never attempted to amend or alter the order. As a consequence, 1934 revenues which were by the terms of the order required to be reduced 10% from the schedule in force on the date of the order became final for the prescribed period. The final order fixed the rate for the future and not for a limited period as did the 1934 order. The 1934 order was vacated and set aside upon procedural grounds but the final order was set aside upon the merits.

In the *Morgan Case,* the issues presented were not tried upon the merits, and as indicated in the opinion of the court in *United States v. Morgan* (1939), 307 U. S. 183, 59 Sup. Ct. 795, 83 L. Ed. 1211, have not yet been tried. When the order of the secretary of agriculture finally fixes a rate it will be a rate taking effect from the date of his order, June 14, 1933, because that was the issue which the secretary

of agriculture attempted to determine and the one which will be passed upon by the supreme court of the United States when the case is finally decided.

In this case there has been a full and complete trial upon the merits. The printed case now before us consists of fourteen volumes, a total of 7,320 pages, and large sections of the record were not printed. In connection with the action to review the final order the whole evidence has been reviewed and it conclusively appears therefrom that the existing rate in accordance with which the plaintiff company collected charges from subscribers for the year 1934 was not unreasonable or unlawful. The situation in this case is entirely different from the situation presented in the *Morgan Case*. While the record at the time the 1934 order was issued was not complete and full, a complete record was made before the issuance of the final order. As we pointed out in the original opinion, this is a single proceeding, not four separate and distinct proceedings.

We have given the brief of defendant full and careful consideration and we discover no reason for modifying the determination already made in this case.

In each case the motion for rehearing and the motion to modify the mandate are denied without costs.